

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

DMP:CRH/JAM/JGH
F.#2020R00515

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

August 26, 2020

**By ECF and Hand**
Honorable Rachel P. Kovner
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.
★ AUG 26 2020 ★
**BROOKLYN OFFICE**

   Re: United States v. Dzenan Camovic
      Criminal No. 20-CR-326 (RPK)

Dear Judge Kovner:

   A grand jury sitting in the Eastern District of New York returned a four-count indictment (the "Indictment") today charging the defendant, Dzenan Camovic, with robbery and firearms offenses arising out of his stabbing, robbery and shooting of members of the New York City Police Department ("NYPD") on the night of June 3, 2020 in Brooklyn. Camovic has also been charged by a Brooklyn state grand jury with several New York State crimes, including multiple counts of attempted murder in the first degree, attempted murder of a police officer, aggravated assault and several weapons offenses.

   The government writes in advance of Camovic's arraignment on the charges contained in the Indictment to respectfully submit that the Court should enter a permanent order of detention because the defendant presents both a severe and ongoing danger to the community and a serious risk of flight. In brief, the defendant presents a danger to the community for two reasons. First, he robbed an NYPD police officer of his firearm in an unprovoked attack so that he could shoot several other police officers and, in fact, shot at those officers, demonstrating his callous disregard for human life. Second, as substantial evidence collected thus far shows, his actions were motivated by his interest in and support for violent Islamist extremism. The defendant also presents a risk of flight because, as an illegal alien with no immigration status in the United States, he has no incentive to remain in the country given his certain deportation.[1]

---

[1] Detailed herein are a proffer of the relevant facts and a discussion of the applicable law pertaining to the pretrial detention of the defendant. See United States v. LaFontaine, 210 F.3d 125, 130-31 (2d Cir. 2000) (government entitled to proceed by proffer in detention hearings). This proffer of facts is not a complete statement of all facts and evidence of which the government is aware or that it will seek to introduce at a detention hearing or trial. Where the content of

I.   The Indictment

The defendant is charged with the following crimes: (1) Hobbs Act robbery, in violation of 18 U.S.C. § 1951(a) (Count One); (2) possessing, brandishing and discharging a firearm in furtherance of a crime of violence, to wit: the Hobbs Act robbery charged in Count One, in violation of 18 U.S.C. §§ 924(c)(i)-(iii) (Count Two); (3) theft of a firearm that has moved in interstate commerce, in violation of 18 U.S.C. § 924(l) (Count Three); and (4) possession of a firearm by a noncitizen illegally or unlawfully in the United States, in violation of 18 U.S.C. § 922(g)(5).

II.   The Offense Conduct

The defendant is a 20-year-old resident of Brooklyn, New York. He is a Bosnian national who was born in Germany. He has no legal immigration status in the United States.[2]

A.   Camovic's Attack and Robbery of NYPD Police Officers

In early June 2020, New York City was under a nightly curfew order from 8:00 p.m. until 5:00 a.m. in response to social unrest after a series of demonstrations took place throughout the City. As a result of the demonstrations, hundreds of NYPD officers were deployed throughout the City to help enforce the curfew, including in Brooklyn.

On the evening of June 3, 2020, at approximately 11:30 p.m., Camovic walked past two uniformed NYPD officers standing near 885 Flatbush Avenue, near the corner of Church Avenue. The two officers were assigned to an anti-looting post that evening. Video footage shows that, after walking past the officers, Camovic walked down the street and appeared to crouch for approximately eight minutes. Camovic then stood up, lingered briefly and then headed back toward the police officers. At approximately this time, Camovic sent a text message to a friend stating "I[']ll be a while." Video footage shows that Camovic then squared an entire block in an apparent effort to approach the two police officers from behind.

At approximately 11:50 p.m., Camovic turned onto Church Avenue, where the two NYPD officers stood on patrol. Upon turning the corner in the direction of the police officers, Camovic immediately took a knife he was holding and stabbed one of the officers in the neck area. After stabbing and wounding the first officer ("Officer 1"), Camovic started chasing the second officer ("Officer 2"), violently lunging at him in an attempt to stab him. Camovic then ran back toward Officer 1 and attacked him again. A struggle ensued, and Camovic fought to take control of Officer 1's service weapon. Ultimately, Camovic forcibly gained possession of Officer 1's service weapon, thereby robbing the officer of his firearm. Using the officer's firearm, Camovic

---

statements, documents, or written communications are described herein, they are done so in pertinent part and in sum and substance, except where quoted or otherwise indicated.

[2] The United States Department of Homeland Security has informed the government that, as a result of Camovic's unlawful status in the United States, an immigration detainer has been lodged against him.

fired multiple shots at the police, including additional officers who had responded to the scene. Responding officers ultimately shot Camovic and took him into custody. Several officers were wounded during the course of Camovic's attack and robbery, including Officer 1, who was stabbed, and Officer 2, who was shot in the hand.

During his attack on the NYPD officers, Camovic repeatedly screamed "Allahu Akbar." The phrase "Allahu Akbar" is an Arabic expression usually translated as "God is the greatest" and is commonly used among Muslims to connote a positive event. However, the phrase has also repeatedly been exclaimed by perpetrators of jihadist terror attacks around the world during the commission of such attacks.[3] For example, according to public reports, in October 2017, after ramming a pickup truck through numerous people on the bike path adjacent to Manhattan's West Side highway, Sayfullo Saipov exited the truck and shouted "Allahu Akbar" as he ran around waving a pellet gun and paintball gun. Saipov later admitted that watching terrorist propaganda videos inspired him to commit this terrorist attack, which killed eight people and injured eleven.

### B. Camovic's Post Arrest Admission of Guilt and Intent

Immediately after the shooting, Camovic was transported from the crime scene to Kings County Hospital where he received treatment for multiple gunshot wounds. Several days later, while Camovic was recovering in the hospital's intensive care unit, Camovic told a medical professional, in sum and substance, that he had killed two police officers and "my religion made me do it."

### C. Camovic's Possession of Jihadist Materials and Interest in Terrorist Organizations

The government's investigation to date shows that, prior to his June 3, 2020 robbery of and attack on the NYPD police officers, Camovic possessed a significant volume of materials that demonstrate his interest in and support for violent Islamist extremism, including the designated foreign terrorist organization the Islamic State of Iraq and al-Sham ("ISIS"). For example, one of Camovic's cellular telephones contained an image with Arabic language stating "The Islamic State. Dabiq. Audios of the Caliphate. Dabiq." "Dabiq" is an official magazine of ISIS, and was used by ISIS to radicalize and recruit followers. Camovic's phone also included an image of an Arabic language media logo superimposed over an ISIS-style flag, and an image with Arabic and English language that stated, "[t]he mujahid walks back to life after death." Notably, these images were found in the "carved" space of the phone, indicating they had been deleted.

Additionally, a search of Camovic's bedroom of his residence in Brooklyn revealed CDs and a thumb drive containing audio and video files of lectures and sermons by Anwar al-

---

[3] See generally "'Allahu Akbar': An Everyday Phrase, Tarnished by Attacks," New York Times, Eric Nagourney, Nov. 2, 2017, available at https://www.nytimes.com/2017/11/02/world/americas/allahu-akbar-terrorism.html (last visited August 10, 2020) (explaining that in addition to its innocuous common use among Muslims, the phrase "Allahu Akbar" has also been seized on by jihadists who claim that Islam justifies their attacks on innocent civilians in the name of God).

3

Awlaki, a U.S.-born radical Islamic cleric and prominent leader of al-Qaeda in the Arabian Peninsula ("AQAP"), who even now, nearly nine years after his death, is still commonly regarded as the leading figure inciting English-speaking Muslims to participate in violent jihad. The same thumb drive recovered from Camovic's bedroom also contained files with logos of al-Hayat Media Center, al-Ajnad and al-Bayan, which are all official ISIS media outlets, as well as images bearing Arabic-language logos which said "The Islamic State" and "Dabiq."

An individual who was interviewed about Camovic during the course of the government's investigation ("Individual 1") informed the government that, approximately one year ago, Camovic had expressed interest in ISIS and other Syrian-based terrorist groups. Although Individual 1 stated that Camovic did not hold extreme religious beliefs, s/he advised that Camovic asked about, among other things, the permissibility of killing civilians and whether killing other Muslim combatants was permissible, like ISIS fighters' killing of other Muslims.

### D. Jihadist Encouragement of Similar Attacks

Notably, foreign terrorist organizations like ISIS have long counseled followers to commit acts of violence using knives and other crude weapons, and have publicly released videos and other materials that demonstrate how to kill people using knives, explicitly calling for such attacks in the United States. Such attack methods have been described in detail in 'how-to-guide' articles in English language jihadist magazines. For example, in October 2016, "Rumiyah," the online propaganda and recruitment magazine published by ISIS, told followers that holy warriors down through Muslim history have "struck the necks of the kuffar"[4] in the name of Allah. The magazine advised its readers that knives are easy to obtain, easy to hide, and deadly, and that they make good weapons in places where the author believed Muslims might be regarded with suspicion. These directives have been repeatedly carried out by followers of ISIS and other foreign terrorist organizations.

Additionally, ISIS has directed followers to take advantage of the recent social unrest in the United States, and commit acts of violence designed to further inflame tensions. For example, on "Shamukh," which is an ISIS-related forum on the dark web, a series of threads on or about May 31, 2020, just days before Camovic's attack, urged supporters in the United States to exploit current social tensions by carrying out physical attacks against law enforcement and protesters to sow further discord.

### E. Camovic's Use of the Dark Web and Encrypted Means of Communication

As noted above, Camovic appears to have deleted or otherwise attempted to remove jihadist propaganda from his electronic devices prior to the June 3, 2020 attack. Camovic also downloaded to his phone – and subsequently deleted prior to his attack – an app associated with the "dark web," which is designed to anonymize and encrypt the user's internet activity. Camovic used multiple social media and messaging platforms, which provided encrypted or otherwise undetectable means of communication and which were used to communicate with individuals

---

[4] "Kuffar" is a term meaning "nonbeliever."

located overseas, and Camovic shifted from one platform to another in an apparent effort to hide these communications.

III.   Legal Standard

Under the Bail Reform Act, Title 18, United States Code, Sections 3141 et seq., a criminal defendant "shall" be detained pending trial upon a judicial finding that "no conditions or combination of conditions will reasonably assure the appearance of the [defendant] as required and the safety of any other person and the community[.]" 18 U.S.C. § 3142(e)(1); see United States v. Mattis, No. 20-1713, 2020 WL 3536277, at *4 (2d Cir. June 30, 2020) ("A district court is instructed to order the pre-trial detention of a defendant if, after a hearing, the judge 'finds that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community.'" (quoting 18 U.S.C. § 3142(e)(1))). The government bears the burden of demonstrating dangerousness by clear and convincing evidence, and risk of flight by a preponderance of the evidence. United States v. Chimurenga, 760 F.2d 400, 405 (2d Cir. 2001).

For certain offenses, including Count Two charged in the Indictment, the law presumes that there is no set of conditions that will reasonably assure the defendant's appearance or the safety of the community. See 18 U.S.C. § 3142(e)(3)(B). This presumption may be rebutted by the defendant, provided the defendant is able to present evidence that he is neither a danger to the community nor a risk of flight. See United States v. Mercedes, 254 F.3d 433, 436 (2d Cir. 2001). Even upon such a showing, however, the presumption in favor of detention "does not disappear entirely, but remains a factor to be considered among those weighed[,]" id., because it "reflects Congress's substantive judgment that particular classes of offenders should ordinarily be detained prior to trial" and "represents Congressional findings that certain offenders . . . are likely to continue to engage in criminal conduct undeterred either by the pendency of charges against them or by the imposition of monetary bond or other release conditions." United States v. Stone, 608 F3d 939, 945-946 (6th Cir. 2010) (internal quotation marks and citation omitted) (ellipsis in original).

In determining "whether the presumptions of dangerousness and flight are rebutted," Mercedes, 254 F.3d at 436, and "whether there are conditions of release that will reasonably assure the appearance of the person as required and the safety of any other person and the community," 18 U.S.C. § 3142(g), the Court must consider: (1) the nature and circumstances of the offenses charged, including whether the offense is a "crime of violence"; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release. See 18 U.S.C. § 3142(g).

IV.   The Court Should Enter a Permanent Order of Detention

As set forth below, each of the Bail Reform Act factors weighs heavily in favor of Camovic's pretrial detention, as he presents both a significant danger to the community and a

5

substantial risk of flight if released on bond. Accordingly, the Court should enter a permanent order of detention pending trial.[5]

### A. The Presumption of Detention

Count Two of the Indictment charges Camovic with possessing, brandishing and discharging a firearm in furtherance of a crime of violence (the Hobbs Act robbery charged in Count One), in violation of 18 U.S.C. §§ 924(c)(i)-(iii). Because Camovic has been indicted for violating Section 924(c), "a statutory presumption in favor of detention arises that 'no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community.'" Mercedes, 254 F.3d at 436 (quoting 18 U.S.C. § 3142(e)).

### B. The Nature and Circumstances of the Charged Offenses

The severity of the charged offenses and defendant's violent disregard for human life cannot be overstated. The defendant's actions on June 3, 2020 – and the terroristic motivations seemingly underpinning them – demonstrate that his release would pose an acute danger to the community.

In the middle of an unprecedented public health crisis and a period of significant social unrest in New York City that required a massive deployment of police to protect public safety and enforce a citywide curfew, Camovic executed a violent attack on two NYPD officers who were simply manning their foot post when he brutally assaulted them, robbed one officer of his weapon, and fired the weapon at the officers and other NYPD officers who responded to the scene. The premediated nature of the initial attack is beyond dispute; Camovic can be seen on video stalking the officers and squaring a city block in order to approach them from behind, all while carrying a knife and after texting a friend that he would "be a while" before meeting up.

The attack and robbery are chilling. Video footage shows Camovic approaching Officer 1 from behind and immediately and violently stabbing him in the neck area, without provocation or warning. The footage then shows Camovic chasing Officer 2 in an attempt to stab him, all while shouting "Allahu Akbar" – the same phrase violent jihadist extremists have screamed while committing similarly violent terrorist attacks. Camovic then struggled with Officer 1, robbed him of his firearm by force and, once he had possession of it, immediately began shooting at the NYPD officers, including officers who responded to the scene. One officer was

---

[5] Camovic is currently detained without bail on New York state criminal charges arising out of the same conduct that gives rise to the charges in the Indictment. On June 5, 2020, the Kings County District Attorney's Office filed a criminal complaint against Camovic charging him with two counts of attempted aggravated murder, two counts of attempted first-degree murder and one count of criminal possession of a weapon in the second degree. On June 30, 2020, Camovic was arraigned on the state charges via videoconference and ordered detained without bail pending trial. Camovic is currently in stable condition and detained on the state charges in a medical unit of the Rikers Correctional Center on Rikers Island.

shot during the attack. Camovic did all of this after consuming a swath of jihadist material, including ISIS propaganda, and at a time when ISIS was encouraging supporters to conduct attacks on law enforcement in the United States and foment further unrest. Camovic also notably downloaded and used several forms of encryption to hide his online activity and communications immediately prior to the attack. Camovic's intent to commit an act of terrorism is further demonstrated by his statement to a medical professional days after the attack that he believed he had killed two police officers and had done so because "my religion made me do it."

The severity of the charged crimes is further reflected by the applicable punishment upon conviction. If convicted, Camovic faces a mandatory minimum sentence of ten years' imprisonment and a maximum sentence of life imprisonment resulting from the Section 924(c) discharge offense alone, a sentence which must run consecutive to any other term of imprisonment imposed. The Hobbs Act robbery carries a 20-year maximum sentence, while Counts Three and Four each carry ten-year maximum terms.

Additionally, based on the evidence obtained to date regarding the defendant's support for ISIS, his consumption of jihadist propaganda, the manner in which he committed the offenses and his own admission of his intent, the terrorism enhancement under Section 3A1.4 of the United States Sentencing Guidelines (the "Guidelines") will apply to the calculation of the defendant's advisory Guidelines range.[6] Based on the application of the terrorism enhancement, the government estimates that the defendant would face an advisory Guidelines range of life imprisonment.

In sum, the defendant's conduct on June 3, 2020 and the extremist motives underpinning it show that Camovic presents a grave danger to the community that no set of release

---

[6] Under this provision, "[i]f the offense is a felony that involved, or was intended to promote, a federal crime of terrorism," the court is to add 12 levels to a defendant's offense level and to increase the defendant's criminal history category to category VI. The application notes to Section 3A1.4 give the term "federal crime of terrorism" the same meaning as set forth in 18 U.S.C. § 2332b(g)(5). Section 2332b(g)(5) defines a "federal crime of terrorism" as (a) a crime that "is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct," and (b) constitutes a violation of one or more of a list of enumerated federal statutes. See 18 U.S.C. § 2332b(g)(5). Because the enhancement applies to conduct that "was intended to promote" a crime of terrorism, there is no requirement that any of the statutes identified in Section 2332b(g)(5) must themselves be proven. See, e.g., United States v. Awan, 607 F.3d 306, 314 (2d Cir. 2010) (holding that the phrase "intended to promote" in Section 3A1.4 "must be applicable ... where the defendant's offense or relevant conduct does not include a federal crime of terrorism") (emphasis in original); United States v. Siddiqui, No. 15-CR-213 (SJ) (E.D.N.Y. Jan. 9, 2020) (applying terrorism enhancement where defendant was not convicted of an enumerated crime of terrorism but where the defendant's conduct was intended to promote the use of a weapon of mass destruction, which is an enumerated crime of terrorism). Here, the enhancement applies because Camovic's conduct was intended to promote, among other crimes, material support for terrorism under 18 U.S.C. § 2339A and material support for a designated foreign terrorist organization under 18 U.S.C. § 2339B.

conditions can mitigate. Additionally, the prospect that Camovic will face a lengthy term of incarceration upon conviction creates a clear incentive for him to flee.

### C. The Weight of the Evidence

The weight of the evidence in this case is overwhelming. Camovic's entire attack and robbery – including his stalking while carrying a knife in order to approach and attack the officers from behind – were captured by security cameras. Police bodycam videos show the attack and robbery at close range, and include clear footage of Camovic forcibly robbing Officer 1 of his firearm, possessing and brandishing the firearm and discharging the firearm at police officers. Audio recorded on the bodycam cameras makes unmistakably clear Camovic's shouting "Allahu Akbar" throughout the attack. Camovic has also already admitted to committing the attack, and his motivation for it, in his unsolicited declarations at Kings County Hospital.

As such, the strength of the evidence against the defendant gives him further motive to flee rather than be convicted at trial.

### D. The Defendant's History and Characteristics

The defendant's history and characteristics further confirm that he presents a substantial risk of flight and danger to the community. As detailed above, the defendant committed a violent, unprovoked and premediated attack on police officers. The frenzied attack demonstrated the defendant's total disregard for human life.

Moreover, the evidence shows that Camovic committed the attack and robbery to promote terrorism, a conclusion supported by, inter alia, Camovic's consumption of jihadist propaganda prior to the attack, the similarities between his attack and other ISIS-inspired terrorist attacks around the world, his screaming the same phrase that Islamic extremists around the world have appropriated and repeatedly used while committing similarly gruesome terrorist attacks and his voluntary admission after the attack that his religion made him do it.

Additionally, as set forth above, the defendant has no legal immigration status in the United States and faces certain deportation, which provides further incentive for him to flee if released.

V.  Conclusion

Each of the 3142(g) factors supports the conclusion that, if released, Camovic would pose a grave danger to the community. Additionally, his lack of legal status in the United States, the overwhelming weight of the evidence against him and the significant prison term he faces upon conviction are all strong incentives for him to attempt to flee prosecution if released on bail.

Accordingly, and for all of the foregoing reasons, including the legal presumption that there is no set of conditions that will reasonably assure the defendant's appearance or the safety of the community, the government respectfully submits that the Court should enter a permanent order of detention pending trial.

Respectfully submitted,

SETH D. DuCHARME
Acting United States Attorney

By:  /s/ Josh Hafetz
Josh Hafetz
Craig R. Heeren
Artie McConnell
Assistant U.S. Attorneys
(718) 254-7000

cc:  Clerk of Court (by ECF)