**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-----------------------------------------------------X

**UNITED STATES OF AMERICA,**

**v.**                                                    **20 Cr. 326 (RPK)**

**DZENAN CAMOVIC**

                    **Defendant.**
-----------------------------------------------------X

**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANT DZENAN CAMOVIC'S MOTION TO DISMISS INDICTMENT**

ROBERT G. STAHL, ESQ.
LAURA K. GASIOROWSKI, ESQ.

Law Offices of Robert G. Stahl, LLC.
53 Cardinal Drive, 3rd Floor Suite 4
Westfield, New Jersey 07090
(901) 301-9001

*Attorneys for Defendant Dzenan Camovic*

## Table of Contents

Table of Authorities…………………………………………………………………………iii

INTRODUCTION………………………………………………………………………...1

POINT I: BACKGROUND: *LOPEZ*, *MORRISON*, AND *JONES* AND THE COMMERCE
CLAUSE POWER…………………………………...………………………………………………2

POINT II: COUNT THREE ALLEGING THEFT OF FIREARM IN INTERSTATE
COMMERCE IN VIOLATION OF 18 U.S.C. §924 (L) IS UNCONSTITUTIONAL AS
APPLIED TO MR. CAMOVIC.......................................................9

POINT III: *SCARBOROUGH V. UNITED STATES* DOES NOT COMPEL THIS COURT TO
REJECT DEFENDANT'S ARGUMENTS REGARDING THE FACIAL AND AS APPLIED
CONSTITUTIONALITY OF §924(l)……………………………………………………..………16

POINT IV: COUNT ONE, HOBBS ACT ROBBERY, AND COUNT FOUR, SECTION
922(G)(5) SHOULD BE SUBJECT TO THE SAME CONSTITUTIONAL CHALLENGE, BUT
THE CONSTITUTIONAL CHALLENGE IS FORECLOSED BY CIRCUIT PRECEDENT…21

POINT V: COUNT TWO, CHARGING A VIOLATION OF 924(C), IS DUPLICITOUS…….23

POINT VI: COUNT TWO MUST BE DISMISSED BECAUSE HOBBS ACT ROBBERY IS
CATEGORICALLY NOT A CRIME OF VIOLENCE…………………………………………25

CONCLUSION……………..…………………………………………………………..26

## Table of Authorities

CASES

*Alderman v. United States*, 562 U.S. 1163 (2011)…………..……………………………………18, 19

*Bailey v. United States*, 516 U.S. 137 (1995)………………..……………………………………..24

*Bond v. United States*, 572 U.S. 844 (2014)…………......……………………………………..8, 21

*Borden v. United States*, ___ S.Ct. ___ (2021)……………………………………………………26

*Brecht v. Abrahamson,* 507 U.S. 619 (1993)..………………………………………………….1

*Cohens v. Virginia,* 19 U.S. 264 (1821)……………………………………………………...1

*Gonzales v. Raich*, 545 U.S. 1 (2005)……………………………………………………*passim*

*Gulf Oil Corp. v. Copp Paving Co., Inc.*, 419 U.S. 186 (1974)……………………………10, 11

*Harris v. United States*, No. 09-CV-4380, 2010 WL 2710600 (E.D.N.Y. July 6, 2010)……..24

*Johnson v. United States*, No. 09-CIV-5554 (PAE), 2013 WL 103174 (S.D.N.Y. Jan. 9, 2013).25

*Jones v. United States*, 529 U.S. 848 (2000)……………………………………………*passim*

*Scarborough v. United States*, 431 U.S. 563 (1977)…………………………………*passim*

*Taylor v. United States*, 136 S.Ct. 2074 (2016)…………………………………………12, 13

*United States v. American Building Maintenance Industries*, 422 U.S. 271 (1975)……………11

*United States v. Bishop*, 66 F.3d 569 (3d Cir. 1995)………..………………………………..20

*United States v. Castleman*, 572 U.S. 157 (2014)……………………………………………26

*United States v. Chesney*, 86 F.3d 564 (6th Cir. 1996)…………………………………………17

*United States v. Combs*, 369 F.3d 925 (6th Cir. 2004)…………………………………………..24

*United States v. Cortes*, 299 F.3d 1030 (9th Cir. 2002)…………………………………………19

*United States v. Elias*, 285 F.3d 183 (2d Cir. 2002)…………………………………………21

*United States v. Gamboa*, 439 F.3d 768 (8th Cir. 2006)…………………………………...24

*United States v. Hill*, 890 F.3d 51 (2d Cir. 2018)…………………………………………26

*United States v. Kirk*, 105 F.3d 997 (5th Cir. 1997)…………………………………………19

*United States v. Lemons*, 302 F.3d 769 (7th Cir. 2002)……………………………...……17, 19

*United States v. Lopez*, 514 U.S. 549 (1995)………………………………………..*passim*

*United States v. Morrison*, 529 U.S. 598 (2000)…………………………..……………*passim*

*United States v. Savoires*, 430 F.3d 375 (6th Cir. 2005)……………………………..…………..23

*United States v. Patton*, 451 F.3d 615 (10th Cir. 2006)……………………………………19, 21

*United States v. Smith*, 101 F.3d 202 (1st Cir. 1996)……………………………………………17

*United States v. Sorrentino*, 72 F.3d 294 (2d Cir. 1995)……………………………………17, 18

*United States v. Weems*, 322 F.3d 18 (1st Cir. 2003)……………………………………………17

*Wickard v. Filburn*, 317 U.S. 111 (1942)……………………………………………………12, 13


STATUTES

18 U.S.C. § 229……………………………………………………………………………………8

18 U.S.C. § 844……………………………………………………………………………..6, 7

18 U.S.C. § 922..……………………………………………………………………………*passim*

18 U.S.C. § 924...........................................................................................................*passim*

Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, 108 Stat. 1796 (1994)……………………………………………………………………………………14

## INTRODUCTION

It has long been a primary principle of federalism that "States possess primary authority for defining and enforcing the criminal law." *Brecht v. Abrahamson,* 507 U.S. 619, 635 (1993); *see also Cohens v. Virginia,* 19 U.S. 264, 428 (1821) ("It is clear, that Congress cannot punish felonies generally"). The Founders rejected the notion of a unitary government, and with it, a national police power, instead placing the power to define and prosecute violent crime with the States. As the Supreme Court declared, "we can think of no better example of the police power, which the Founders denied the National Government and reposed in the States, than the suppression of violent crime and vindication of its victims." *United States v. Morrison*, 529 U.S. 598, 618 (2000). Indeed, the State's interest and role in defining and prosecuting local crimes is so significant that even when the federal government has jurisdiction to prosecute a crime, they are generally instructed to defer to the State.

The instant case brings to the fore issues of federal overreach and intrusion into the police power reserved to the States. Dzenan Camovic has been charged with multiple state crimes defined by the New York Legislature, in connection with his assault on New York City police officers. Notwithstanding New York's primary interest in prosecuting local violent crime, and the entirely intrastate nature of Mr. Camovic's offenses, the federal government has chosen to bring a corollary federal prosecution with draconian penalties. Each of the federal crimes with which Mr. Camovic is charged relies on an interstate commerce element as the basis for the exercise of federal jurisdiction over what is otherwise purely local criminal activity. In each, excepting the 18 U.S.C. § 924(c) charge which rests federal jurisdiction on the commission of an underlying federal crime of violence, the requisite interstate commerce "nexus" is the prior interstate travel of the firearm, which is the subject of both the Hobbs Act Robbery,

1

18 U.S.C. § 1951; Theft of a Firearm, 18 U.S.C. § 924 (l); and Possession of a Firearm by a

Prohibited Person, 18 U.S.C. § 922(g) counts, and the fact that the New York City Police

Department has offices in multiple states. *See* Indictment ¶¶ 3 & 5. The Government contends

that these interstate commerce elements are the basis for its jurisdiction and justify pursuing such

a prosecution, even though the State has already indicted Mr. Camovic for the identical conduct.

In each statute, that jurisdictional element is a touchstone of Congress's use of its

Commerce Clause powers and the extent of its authority to regulate pursuant to that power. Here,

the application of these statutes constitutes an unconstitutional exercise of Congress's Commerce

Clause power, and an intrusion into the police power of the State and the Tenth Amendment.

Accordingly, Mr. Camovic seeks dismissal on the basis that the federal statutes are

unconstitutional as applied to him.

I.      BACKGROUND: *LOPEZ*, *MORRISON*, AND *JONES* AND THE COMMERCE
        CLAUSE POWER

In *United States v. Lopez*, 514 U.S. 549 (1995), the Supreme Court confirmed that

Congress's Commerce Clause power is subject to outer limits, striking down a firearm

possession statute, 18 U.S.C. § 922(q), as exceeding the permissible boundaries of congressional

power under the Commerce Clause because "[t]he Act neither regulates a commercial activity

nor contains a requirement that the possession be connected in any way to interstate commerce."

*Id*. at 551. This case provides a foundational understanding of the scope of Congress's power to

make entirely intrastate crime that is more typically the sole province of the States a federal

crime.

In determining whether the statute could be upheld against a constitutional challenge, the

Court delineated three general categories of regulation in which Congress is authorized to engage

under its commerce clause power: 1) use of the channels of interstate commerce; 2) the

instrumentalities of interstate commerce or things and persons in interstate commerce; and 3) "those activities having a substantial relation to interstate commerce, *i.e., those activities that substantially affect interstate commerce*." *Id.* at 558-59 (emphasis added).

The *Lopez* Court first determined that 18 U.S.C. § 922(q), which prohibited possession of a firearm in a school zone, did not fit into either of the first two categories and could not be justified under the third because it "is a criminal statute that by its terms has nothing to do with 'commerce' or any sort of economic enterprise, however broadly one might define those terms." *Id.* at 561. Moreover, the Court found that the statute "is not an essential part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated." *Id*. As such, the statute "cannot . . . be sustained under our cases upholding regulations of activities that rise out of or are connected with a commercial transaction, which viewed in the aggregate, substantially affects commerce." *Id*. Notably, the Court stressed that 18 U.S.C. § 922(q) was aimed at activity in which "neither the actors nor their conduct has a commercial character," *id.* at 580 (Kennedy, J., concurring), and, as a criminal statute, prohibited an activity which was traditionally an area of State concern. *Id.* at 561 n.3, 567, 577 (Kennedy, J., concurring).

The Government had argued that § 922(q) was valid because possession of a firearm in a local school zone does, in fact, substantially affect interstate commerce, citing to the increased risk of violent crime and resultant economic impact of crime on the economy. *Id*. at 563-64. Nevertheless, the Government had to agree that this "costs of crime" reasoning would permit Congress not only the power to regulate all violent crime, but all activities that lead to such crime. *Id*. at 564. This argument was rejected by the Court, which cautioned that though some of its prior cases had taken "long steps" down the road of converting congressional authority under

3

the Commerce Clause to a police power, expanding the Commerce Clause further, as suggested by the Government, "would require us to conclude that the Constitution's enumeration of powers does not presuppose something not enumerated…and there will never be a distinction between what is truly national and what is truly local. *Id*. at 567-68 (first citing *Gibbons v. Ogden*, 22 U.S. 1 (1824); and then citing *N.L.R.B. v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 30 (1937).

The statute's lack of a jurisdictional element was also a factor. A jurisdictional element might have ensured that § 922(q)'s application embraced only interstate activity or those wholly intrastate possessions that had a substantial relation to interstate commerce. *Id* at 561-62. As the Court opined, an "express" jurisdictional element may have assisted in reining in the otherwise overly broad expanse of the statute, limiting the reach of § 922(q) instead to "a discrete set of firearm possessions that additionally have an explicit connection with or effect on interstate commerce." *Id*. at 562.

*Lopez* brought back to the fore the significance of the system of federalism and the importance of the Tenth Amendment after an expansion of the commerce powers as the national economy grew. *Id*. at 555-56. *Lopez'*s articulation of the outer limits of the commerce power was not so much a contraction of those powers but a recognition that the exercise of congressional authority over purely local or intrastate activities must have a substantial effect on interstate commerce to justify the intrusion on the States' powers. *Id*. (citing *United States v. Wrightwood Dairy Co.,* 315 U.S. 110, 119 (1942)) (explaining the commerce power "extends to those intrastate activities which in a substantial way interfere with or obstruct the exercise of the granted power"). As the Court stressed, the "outer limits" of congressional powers under the Commerce Clause are part of, and necessary to "the distinction between what is national and what is local." *Id.* at 556-57 (quoting *Jones & Laughlin Steel Corp.* 301 U.S. at 30).

4

Subsequently, in *Morrison*, 529 U.S. at 617, the Supreme Court again echoed *Lopez*'s concern with the outer limits of Congress's power to regulate activities that "substantially affect" commerce by specifically rejecting the "argument that Congress may regulate noneconomic, violent criminal conduct based solely on that conduct's aggregate effect on interstate commerce."[1]  The Court was again presented with a regulation lacking a jurisdictional element, but it was not simply the lack of such an element that contributed to the Court's striking down the statute. The Court was concerned with the federal intrusion into areas traditionally reserved to the States, and the blurring of the distinctions between what is truly national and truly local by the exercise of congressional authority in those areas. *Id.* at 618 (citing *Lopez*, 514 U.S. at 568). The Court reiterated that "[t]he regulation and punishment of intrastate violence that is not directed at the instrumentalities, channels, or goods involved in interstate commerce that has always been the province of the States."  *Id.* at 617 (citing *Cohens*, 19 U.S. at 425-26) (noting Congress "has no general right to punish murder committed within any of the States" and that it is "clear . . . that [C]ongress cannot punish felonies generally"). The Court affirmed that the reach of Congress's commerce power over intrastate activities must be limited to *commercial activity* that is in commerce or, if wholly local, that substantially affects interstate commerce. *Id.* at 610. "*Lopez*'s review of Commerce Clause case law demonstrates that in those cases where we have sustained federal regulation of intrastate activity based upon the activity's substantial effects on interstate commerce, the activity in question has been some sort of economic endeavor." *Id.* at 611 (citing *Lopez*, 514 U.S. at 559-60). Without such a limit, "the concern that we expressed in

---

[1] In *Morrison*, the statute at issue was the civil remedy provision of the Violence Against Women Act, 42 U.S.C. § 13981(b) (VAWA), which provided a federal civil remedy for the victims of gender-motivated violence. Congress supported its legislation with factual findings outlining the impact of gender-based violence on interstate commerce, and the Government invoked the aggregate effect of such violence on interstate commerce to uphold the statute, which also lacked a jurisdictional element. The Court ruled that the statute exceeded constitutional authority to regulate interstate commerce. 529 U.S. at 617-18.

*Lopez* that Congress might use the Commerce Clause to completely obliterate the Constitution's distinction between national and local authority seems well founded." *Id*. at 615.

Yet again, in *Jones v. United States*, 529 U.S. 848, 851 (2000), the constitutional concerns brought to the fore by *Lopez* dominated the Court's decision in addressing interpretations of the federal arson statute and its application to a residential home. This time the statute, 18 U.S.C. § 844, actually had a jurisdictional element, prohibiting arson of a building "used" in interstate commerce or in any activity "affecting interstate . . . commerce," language that signaled Congress's intent to invoke the full extent of its Commerce Clause powers. *Jones*, 529 U.S. at 855. Despite the explicit cabining of the statute's scope to commercial buildings and buildings used for commercial purposes, the Government, citing the "affecting commerce" language, insisted on a broader interpretation of the jurisdictional element. *Id.* The Government argued that the home was used "in or affecting commerce" because it was "used" as collateral to secure a mortgage from an out-of-state lender, "used" to obtain an insurance policy from an out-of-state insurer, and "used" to receive natural gas from out-of-state sources. *Id.* at 855-56. In the Government's broad reading, these multiple connections to interstate commerce, though passive or in the past and unrelated to the "function" of the building as a "commercial" building, placed the arson of that home within the purview of the statute because of Congress's use of the statutory term "affecting . . . commerce" and Congress's invocation of its full Commerce Clause authority. *Id.*

The Court concluded that a broad interpretation of the jurisdictional element permitting the statute to apply to arsons of residential homes on the basis of these interstate commerce "nexuses" was too ubiquitous in the modern world and raised the concerns expressed in *Lopez* about Congress's regulation of "activity in which neither the actors nor their conduct had a

commercial character," in an area that was one of traditional State concern. *Id.* at 858 (first citing *Lopez*, 514 U.S. at 561 n.3, 560-62; and then citing *United States v. Bass*, 404 U.S. 336, 350 (1971)). Arson of a residential home was intrastate criminal conduct traditionally defined and prosecuted by the States. *Id.* The Court was thus guided by "the concerns brought to the fore in *Lopez*" which rendered it "appropriate" to avoid the "grave and doubtful constitutional questions" that would arise if the Court accepted the Government's interpretation of the statute to cover arson of a non-commercial, private residence. *Id.* at 855. Instead, the Court read the statutory language more narrowly, deciding that the "provision [requiring that a building be 'used' in an activity affecting commerce] covers only property *currently used in commerce or in an activity affecting commerce*" and leaving the arson of a residence "to the law enforcement authorities of the State." *Id.* (emphasis added).

Once again, the balance of state and federal powers was at the heart of the Court's decision. As the Court observed, accepting the Government's expansive interpretation of 18 U.S.C. § 844(i), in which it rested federal jurisdiction on interstate commerce nexuses that were either in the past (the "use" of the home as collateral), or unrelated to the commercial character or use of the home (the connection of the residence to interstate natural gas lines, and insurance from an out-of-state insurer), would mean that "hardly a building in the land would fall outside the federal statute's domain" given that buildings are constructed with out-of-state materials, financed by interstate financial institutions, served by interstate utilities or necessarily bear "some other trace of interstate commerce." *Id.* at 857. Such attenuated or "trace" interstate commerce nexuses would permit the statute to apply far too broadly, sweeping in virtually every home, without any connection to commercial activity or economic enterprise to warrant exercise of federal jurisdiction over the local arson crime. Quite simply, "[t]o read § 844(i) as

7

encompassing the arson of an owner-occupied private home would effect . . . [a significant change in the federal-state balance in the prosecution of crimes], for arson is a paradigmatic common-law state crime." *Id*. at 858

The significance of the Tenth Amendment and the balance of  State and national power was once again the center of another Supreme Court case addressing a criminal statute in *Bond v. United States*, 572 U.S. 844 (2014). In *Bond*, the federal government charged a woman who had used chemical irritants to injure a romantic rival under 18 U.S.C. § 229, a federal statute prohibiting the use of chemical weapons and enacted pursuant to a treaty. *Id.* at 865. Echoing the Court's observation in *Jones* about the Government's broader reading of the arson statute, the Court in *Bond* similarly understood that by accepting the Government's reading of the clear words of § 229, "hardly" a poisoning "in the land would fall outside the federal statute's domain." *Id*. at 863 (quoting *Jones,* 529 U.S. at 857). The Court again focused on the importance of the constitutional balance between the national government and the States: "[b]y denying any one government complete jurisdiction over all the concerns of public life, federalism protects the liberty of the individual from arbitrary power." *Id.* at 880. As in *Jones*, the Court was concerned that the Government's reading of 18 U.S.C. § 229 would alter the "sensitive federal-state relationships" by converting an astonishing amount of "traditionally local criminal conduct" into "a matter for federal law enforcement."  *Id*. at 859 (quoting *Bass*, 404 U.S. at 349-50).

*Lopez, Morrison* and *Jones* thus establish the structure for the analysis of the constitutionality of each of the federal statutes charged in the instant case, each an asserted exercise of Congress's commerce power to regulate purely intrastate, local criminal activity. The Court's holdings in each of these three cases signaled the braking of a runaway train of federal encroachment on the States' traditional role in punishing local crime and a recognition that the

principles of federalism are central to the interpretation and application of criminal statutes with only tangential relation to interstate commerce. Like the arson statute in *Jones*, the instant statutes all contain jurisdictional elements, but nonetheless raise *Lopez*'s concerns about the nebulous limits to the assertion of a commerce power that ultimately is not anchored at all in interstate activity or commercial activity or economic enterprise.

II.     COUNT THREE ALLEGING THEFT OF A FIREARM IN INTERSTATE COMMERCE IN VIOLATION OF 18 U.S.C. § 924(l) IS UNCONSTITUTIONAL AS APPLIED TO MR. CAMOVIC

18 U.S.C § 924(l) prohibits the theft of any firearm which "is moving in, or is a part of or which has moved in interstate commerce or foreign commerce." The Government has charged Mr. Camovic in Count Three only under the third prong of the statute's jurisdictional element, with "steal[ing] a firearm *which had moved in interstate and foreign commerce*, to wit: a Sig Sauer P226 black semiautomatic 9 mm handgun and ammunition."  As further alleged in paragraph three of the Indictment, the required "movement" in interstate commerce establishing federal jurisdiction is that the handgun was manufactured outside the State of New York. Thus, the only connection between Mr. Camovic's non-economic, non-commercial criminal activity and "commerce" is the fact that at some point prior to its theft, the firearm was manufactured outside of New York and moved across state lines before it came into the possession of a New York City police officer.

The first two jurisdictional bases found in the statute – theft of a firearm *moving* in interstate commerce or that *is a part of* interstate commerce – quite clearly fall under the second *Lopez* category: regulation of "the instrumentalities of interstate commerce, or persons or things in interstate commerce." 514 U.S. at 558. The rationale of this second category is that in addition to protecting the instrumentalities of commerce, such as planes, railroads, and other means,

9

Congress may protect the persons or things those instrumentalities are moving. *Id*.; *see also United States v. Bishop*, 66 F.3d 569, 598 (3d Cir. 1995) (Becker, J., concurring in part and dissenting in part), *cert. denied*, 516 U.S. 1032 (1995) (discussing a statute's jurisdictional element regulating present or recent movement in commerce as invoking the second *Lopez* category, under which Congress is authorized to protect and regulate the "instrumentalities" of commerce, and people and "things that the instrumentalities are moving").

The third prong of § 924(l)'s jurisdictional element, proof that a firearm "has moved in interstate commerce," does not fall under the first or second *Lopez* category. It does not require that the firearm was moving in commerce or was at an interstate facility or instrumentality at the time of its theft. A firearm that has moved in commerce sometime in the past is no longer "in commerce."  "In commerce" has a very specific meaning, denoting "only persons or activities within the flow of interstate commerce-the practical, economic continuity in generation of goods and services for interstate markets and their transport and distribution to the consumer. *Gulf Oil Corp. v Copp Paving Co., Inc.*, 419 U.S. 186, 195 (1974).  As worded, this prong of the jurisdictional element, unlike the first two, is not regulating the use of the channels or instrumentalities of commerce for a harmful purpose. There is no requirement that the movement of the firearm have any connection to the defendant's criminal conduct.  In contrast to the statute's application under the "moving in interstate" or presently "part of interstate commerce" prongs, the statute's regulation of theft of a firearm that  "has moved in interstate commerce" does not require movement contemporaneous with or even proximate to the theft.

The statute does not invoke Congress's full Commerce Clause powers, lacking the "affecting commerce" language that is accepted as asserting the third category in *Lopez*, under which Congress may regulate "those activities having a substantial relation to interstate

activities, *i.e.*, those activities that substantially affect interstate commerce." 514 U.S. at 558-59. Because the third prong of the jurisdictional statute, requiring only past movement in the channels of commerce, does not fit in the first or second *Lopez* categories, application of the statute where this jurisdictional element is alleged constitutes a constitutional exercise of Commerce Clause authority only if it fits within the third *Lopez* category: regulating activity that substantially affects interstate commerce. *Id.* It clearly does not.

Utilizing the framework of analysis in *Lopez* and *Morrison*, the first inquiry is whether the statute is directed at commercial activity. Like the firearms statute in *Lopez*, the jurisdictional "subsection" of § 924 (l) "has nothing to do with 'commerce' or any sort of economic enterprise." 514 U.S. at 560-62, 580. The criminal theft of a firearm that has already moved in commerce is not itself commercial activity. It has nothing to do with production, buying or selling of a product. Nor does the theft become transformed into "commercial activity" because it is putatively a crime motivated by economics; whether or not that crime has an economic impact that somehow affects the national economy also does not change its essential nature.

Commerce is a specific term, defined in the Federal Constitution and in case law. *See Copp Paving Co.*, 419 U.S. at 195 (defining "in commerce" as "only persons or activities within the flow of interstate commerce – the practical, economic continuity in generation of goods and services for interstate markets and their transport and distribution to the consumer"); *see also United States v. Am. Bldg. Maint. Indus.*, 422 U.S. 271, 276 (1975). The third prong of § 924(l) quite clearly prohibits the *activity of local crime*, not commerce. The statute is aimed solely at criminal conduct and, as applied here, conduct that occurs after a weapon has moved in commerce, and unrelated to that movement. That the firearm may have moved in commerce at some point in the past, before its theft, does not make its theft somehow within the sphere of

11

commerce; it does not limit its application to interstate activity or only those intrastate activities having a substantial effect on commerce. It is so minimal a nexus as to be merely a "trace" and does not sufficiently narrow its application given that mostly all firearms have "moved in commerce." As Justice Kennedy cautioned in *Lopez*, a statute based on such an attenuated nexus to interstate commerce encompasses purely intrastate activity in a way that is far too broad given that, in our current interdependent world, any conduct has an "ultimate commercial origin or consequence." 514 U.S. at 580 (Kennedy, J., concurring).

The argument that Congress is permitted to regulate theft because of a larger national market in stolen firearms, or the sum effect of firearm thefts nationwide on the economy, is also a thin reed. The Supreme Court certainly has held that activities in *Lopez*'s third category – those that "substantially affect" commerce – may be regulated so long as they substantially affect interstate commerce in the aggregate, even if their individual impact on interstate commerce is minimal. *Taylor v. United States*, 136 S.Ct. 2074, 2080 (2016) (citing *Wickard v. Filburn*, 317 U.S. 111, 125 (1942)) (explaining "even if appellee's activity be local and though it may not be regarded as commerce, it may still, whatever its nature, be reached by Congress if it exerts a substantial economic effect on interstate commerce"). Thus, in *Taylor*, the production, possession, and distribution of controlled substances constituted a "class of activities" that in the aggregate substantially affect interstate commerce, and therefore, the Court held, Congress possesses the authority to regulate (and to criminalize) the production, possession, and distribution of controlled substances even when those activities occur entirely within the boundaries of a single State. *Id*.

As broad as this category is, however, it has also been accompanied by the Court's coda that "thus far in our Nation's history our cases have upheld Commerce Clause regulation of

intrastate activity only where that activity is economic in nature." *Id.* at 2079-80 (quoting *Morrison,* 529 U.S. at 613). Indeed, in *Morrison* the Supreme Court expressly rejected the proposition that individual instances of *local criminal* activity can be aggregated in order to create a substantial effect on interstate commerce. 529 U.S. at 615-19. Like the VAWA statute in *Morrison*, § 924(l) has no underlying commercial or economic activity at the base of the statute's prohibition. 529 U.S. at 610. There is simply no analogy that because there is a market for guns (as there is for every commodity, from an NFT to a Pokemon collectible), a criminal statute like § 924(l) can be upheld because theft of guns is a "class of activities" that in the aggregate, substantially affect interstate commerce and can then be regulated, like the production and consumption of wheat in *Wickard*, 317 U.S. at 125, and the manufacture and sale of drugs in *Taylor*, 136 S.Ct. at 2079-80. The power to regulate *intra*state commerce which substantially affects *inter*state commerce cannot sanction federal regulation of intrastate activities that are *unrelated* to commerce. Otherwise, the federal government would have free reign to encroach on noneconomic areas of State concern, and most pointedly, the State's power and authority to define and prosecute violent crime. *See Lopez*, 514 U.S. at 595 (Thomas, J., concurring).

The mere fact that there is a market for guns does not transform local firearm thefts into a commercial activity, or economic enterprise. Guns are certainly not a fungible commodity, like marijuana or wheat. *See Gonzales v. Raich*, 545 U.S. 1, 18 (2005)  (noting "[l]ike the farmer in *Wickard*, respondents are cultivating, for home consumption, a fungible commodity for which there is an established, albeit illegal, interstate market"). Indeed, in *Raich*, the Supreme Court specifically distinguished Congress's ability to regulate intrastate possession of marijuana from the regulation of criminal activity, like gun possession or rape in *Lopez* and *Morrison*, because the activities regulated by the Controlled Substance Act (CSA) "are quintessentially economic,"

referring to "the production, distribution and consumption of commodities." *Id.* at 25-26 (citation omitted); *see also Lopez*, 514 U.S. at 561 (distinguishing gun control statute as "a criminal statute that by its terms has nothing to do with 'commerce' or any sort of economic enterprise, however broadly one might define those terms").

Moreover, even extensive factual findings by Congress as to the economic effects of the regulated activity on commerce will not insulate a statute from judicial review. *Morrison*, 529 U.S. at 614.  First, the fact that Congress has concluded that a particular activity substantially affects interstate commerce "does not necessarily make it so." *Id.* (quoting *Lopez*, 514 U.S. at 557 n.2). That determination is ultimately for the court to make. "Whether particular operations affect interstate commerce sufficiently to come under the constitutional power of Congress to regulate them is ultimately a judicial rather than a legislative question, and can be settled finally only by this Court." *Id.* (quoting *Lopez*, 514 U.S. at 557 n.2).

 Accordingly, in *Lopez*, the Court conducted its own "independent evaluation" to determine whether the "substantially affects" test was satisfied. 514 U.S. at 562-63. Here, however, there are *no* congressional findings regarding the effects of local gun thefts on interstate commerce to evaluate, nor are there any findings regarding the economic impact  of firearm thefts or firearm thefts in general related to the passage of the original theft of firearm provision, § 924(k). Additionally, the statute itself does not contain any express findings. *See* Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, 108 Stat. 1796 (1994); *see Lopez*, 514 U.S. at 562.

Section 924(l) is distinguished from § 922(q) in *Lopez* and the VAWA in *Morrison* by the existence of a jurisdictional element. The jurisdictional element charged here, a gun's past movement in commerce, has no real or substantial connection to the activity regulated, the theft

14

of that firearm. Under this third prong of the jurisdictional element, the prior movement of the firearm in commerce and the instrumentalities of commerce need not have occurred at any point proximate to the theft, or have any relation to the offender or the offense itself. In this sense, the jurisdictional element is not a nexus between the activity or the person regulated and interstate commerce, but a more attenuated nexus in the past of the firearm. The purpose of a jurisdictional element is to delineate a *limited* application of the regulation only to those activities that *substantially affect* interstate commerce, *Morrison*, 529 U.S. at 611-12 (citing *Lopez*, 514 U.S. at 562), ensuring that it encompasses only interstate activity and only those intrastate activities that substantially affect interstate commerce. This element fails to accomplish that. First, it is attenuated. Second, given that most firearms are manufactured in a small number of states or imported from overseas and sold throughout the United States, the statute actually captures the theft of almost every firearm without ensuring the requisite substantial effect on interstate commerce.

Finally, § 924(l) is not essential to the working of a "comprehensive regulatory scheme" like the statutes at issue in *Raich* and *Taylor*. The fact that firearms are subject to federal regulation under other statutes does not equate to this particular firearm statute constituting a necessary part of a larger, closed regulatory scheme, a point made by the Court earlier in *Lopez*. There, the Court specifically stated that § 922(q) "is not part of a larger regulation of economic activity, in which the regulatory scheme would be undercut unless the intrastate activity were regulated." 514 U.S. at 560. Unlike the hodge-podge of federal gun laws, the CSA is a "lengthy and detailed statute creating comprehensive framework for regulating the production, distribution and possession of five class of 'controlled substances.'" *Raich*, 545 U.S. at 24. There is no similar comprehensive regulatory regime that bans possession and manufacture of all guns,

as the CSA does with controlled substances. The federal patchwork of firearm regulations spans decades and cannot be characterized as a single regulatory scheme of interdependent parts like the CSA.

Section 924(l) directly extends Congress's power to include the definition and punishment of criminal conduct more typically the province of the states. All states have laws prohibiting thefts and nothing in the statute or its history demonstrates a failure on the part of states to criminalize gun theft. New York makes theft of a firearm a felony offense. The penalties for those statutes, as the product of the Legislature, represent the collective determination of the People of New York as to what the appropriate punishment for such theft should be. New York's citizens also have a more direct and substantial interest in New York's prosecution of this local crime. As *Lopez*, *Morrison* and *Jones* resoundingly demonstrated, broad criminal regulation in an area where states have "historically been sovereign" upsets the federal and state, local and national balance the Founders so carefully created, and implicates the Tenth Amendment. *See Lopez*, 514 U.S. at 561 n.3 (citations and internal quotation marks omitted) (explaining "[u]nder our federal system, the States possess primary authority for defining and enforcing the criminal law . . . When Congress criminalizes conduct already denounced as criminal by the States, it effects a change in the sensitive relation between federal and state criminal jurisdiction").

III.   *SCARBOROUGH V. UNITED STATES* DOES NOT COMPEL THIS COURT TO REJECT DEFENDANT'S ARGUMENTS REGARDING THE FACIAL AND AS APPLIED CONSTITUTIONALITY OF § 924(l)

*Scarborough v. United States*, in which the Supreme Court held that the government need only prove that the firearm possessed by a felon had been, "at some time, in interstate

16

commerce" to demonstrate the interstate commerce element of 18 U.S.C. § 1202 (prohibiting possession by a felon of a firearm "in or affecting commerce") is not controlling here. 431 U.S. 563, 575 (1977). It is true that *Scarborough* has been applied to uphold the constitutionality of the more contemporary felon in possession statute, 18 U.S.C. § 922 by the Second Circuit Court of Appeals and other courts.[2] *See, e.g.*, *United States v. Sorrentino*, 72 F.3d 294, 297 (2d Cir. 1995), *overruled on other grounds*, *United States v. Abad*, 514 F.3d 271 (2d Cir. 2008); *see also United States v. Weems*, 322 F.3d 18, 26 (1st Cir. 2003). Even in the wake of *Lopez*, these courts view *Scarborough,* and prior circuit precedent embracing *Scarborough*, as *requiring* a finding that 18 U.S.C. § 922(g) is constitutional. *United States v. Lemons,* 302 F.3d 769, 772-73 (7th Cir. 2002) (noting that because "*Scarborough* suggested that prior movement of the firearm in interstate commerce would suffice to meet [the jurisdictional element], we have, in the wake of *Lopez,* repeatedly rejected Commerce Clause challenges to application of the felon-in-possession statute" and as to any reversal "it is for the Supreme Court to so hold"); *United States v. Smith,* 101 F.3d 202, 215 (1st Cir. 1996) (deciding that *Scarborough* applied because of the jurisdictional hook in the statute); *United States v. Chesney,* 86 F.3d 564, 571 (6th Cir. 1996) (adhering to *Scarborough*).

In *Sorrentino,* the Second Circuit accepted the settled interpretation of the felon in possession statute as requiring only a "minimal nexus" between possession of a firearm by a convicted felon and interstate commerce, an interpretation that expressly relied on *Scarborough*. *Sorrentino,* 72 F.3d at 296; *Scarborough,* 431 U.S. at 575-77. *Scarborough* is not applicable as precedent here, however, and this court is not bound by the Second Circuit's

---

[2] 18 U.S.C. § 922(g)(1) makes it illegal for a felon "to ship or transport in interstate or foreign commerce, or *possess in or affecting commerce*, any firearm or ammunition; or to receive any firearm . . . which has been shipped or transported in interstate or foreign commerce."

application of the case to the question of the constitutionality of § 922(g)(1). First, *Scarborough* is not direct precedent expressly upholding the constitutionality of firearm statutes or the "moved in commerce" jurisdictional element. *Scarborough* did not address or decide whether the statute was a constitutional exercise of Commerce Clause power, as neither party raised the issue. *See Alderman v. United States*, 562 U.S. 1163 (2011) (Thomas, J., dissenting) (highlighting that no party alleged that § 1202 exceeded Congress's authority and that the Court did not hold that the statute was constitutional). Reading *Scarborough*'s holding that the prior movement of a firearm satisfies § 1202's "in and affecting commerce" requirement to constitute a decision that Congress is constitutionally permitted to use past movement of a firearm as the basis for federal jurisdiction conflates the statutory interpretation conducted by the Court there with the constitutional question presented here. A careful reading of *Scarborough* confirms that case was exclusively about statutory construction. The Court's inquiry into the legislative history of 18 U.S.C. § 1202 was focused on divining Congress's intent in drafting the statute and choosing the specific words used, so as to choose the construction of the statute that gave effect to that intent, not looking to see if the legislative history laid out facts establishing that the prohibited activity "substantially affects interstate commerce." *Scarborough*, 431 U.S. at 576-78. The Court's ultimate determination was that the government's definition of "in and affecting commerce" "captures the essence of Congress'[s] intent, striking at the possession of weapons by people who have no business possessing [them]." *Id*. at 577 (citation omitted).

Second, and more importantly, *Scarborough* is in conflict with *Lopez* and its progeny. *Scarborough* precedes *Lopez* by decades, so even if *Scarborough* had addressed the constitutionality of the "in and affecting commerce" language, as opposed to a strict statutory interpretation, it would have done so without the clarity of the current Commerce Clause case

law outlining the outer limits of that power. Now, those outer limits undermine *Scarborough*.

Indeed, it is difficult, if not impossible, to reconcile the Supreme Court's later decisions in *Jones,*

*Morrison* and *Lopez* with the holding in *Scarborough*, as Justice Thomas stated succinctly in his

dissent questioning denial for a writ of certiorari in *Alderman*, 562 U.S. at 1163, and as other

courts have also acknowledged. *See, e.g.*, *United States v. Patton*, 451 F.3d 615, 634-36 (10th

Cir. 2006) (acknowledging considerable tension between *Scarborough* and *Lopez*'s categories,

but deciding court was "bound" by *Scarborough* in interpreting statute prohibiting possession of

body armor with identical commerce element); *Lemons*,  302 F.3d at 773 (noting "ample Seventh

Circuit precedent" upholding § 922(g)(1) and suggesting that if *Lopez* undercuts this approach,

"it is for the Supreme Court to so hold"); *United States v. Cortes,* 299 F.3d 1030, 1037 n.2 (9th

Cir. 2002) (noting that doubts have been raised but choosing, "[u]ntil the Supreme Court tells us

otherwise," to "follow *Scarborough* unwaveringly"); *United States v. Kirk,* 105 F.3d 997, 1004

(5th Cir. 1997) (relying on the third *Lopez* category instead of the more expansive approach

in *United States v. Bass,* 404 U.S. 336, 350 (1971), a predecessor case to *Scarborough,* and

noting that "[i]t is not for us to say that *Bass* cannot survive *Lopez*"); *see also Kirk*, 105 F.3d at

1016 n.25 (finding statute unconstitutional under the three *Lopez* categories yet noting that "[w]e

are not at liberty to question" *Scarborough,* despite its "tension" with *Lopez)*; *United States v.*

*Bishop*, 66 F.3d 569, 588 n.28 (3d Cir. 1995) (upholding 18 U.S.C. § 2119, a carjacking statute,

because of its jurisdictional hook and noting that until the Supreme Court is more explicit on the

relationship between *Lopez* and *Scarborough*, a lower court is "not at liberty to overrule existing

Supreme Court precedent"); *see also id.* at 593-97 (Becker, J., concurring in part and dissenting

in part) (criticizing majority for relying on *Scarborough,* which "was devoid of any Commerce

Clause analysis," and insisting that a jurisdictional hook could make an application of a statute

constitutional only if it also fell within one of the three *Lopez* categories). Notably, these courts felt constrained to apply Scarborough to § 922(g) and related statutes with similar "in and affecting" commerce elements by previous panel decisions and by the fact that *Scarborough* has not explicitly been overruled.

Even if *Scarborough* is directly precedential as to the jurisdictional element in § 922(g), notwithstanding its conflict with current Supreme Court case law, it is not directly applicable to § 924(l). *See Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477 (1989) (instructing that a Court of Appeals must follow the case that directly controls, if a precedent of the Court has direct application, even when it appears to rest on reasons rejected in some other line of decisions). 18 U.S.C. § 922(g), like § 1202, is a felon-in-possession statute, and it also shares the identical "in and affecting commerce" language. That language is absent from § 924(l), an entirely different statute with a different jurisdictional element that does not invoke Congress's full Commerce Clause powers and cannot be analogized to the statute in *Scarborough*. More importantly, unlike § 922(g) and related statutes, there are no decisions in this circuit or others upholding the constitutionality of § 924(l) before or after *Lopez* or determining that the issue is controlled by *Scarborough*. Even those courts with doubts as to *Scarborough*'s "vitality" after *Lopez*, *Morrison* and *Jones* were constrained by prior holdings in those circuits adhering to *Scarborough* and the lack of an explicit overruling of *Scarborough* by the Supreme Court. *See Patton*, 451 F.3d at 636 (acknowledging considerable tension between *Scarborough* and *Lopez*'s categories, but "bound" by *Scarborough* in interpreting statute prohibiting possession of body armor with identical commerce element by prior decisions of the Court). This Court may address the issue of § 924(l)'s constitutional application *res nova*.

This Court must consider the statute in contemporary terms, and with the benefit of a trajectory of cases that have emphasized that the congressional power under the "substantially affects" test is limited to the regulation of economic or commercial activities. Without such a demarcation, the enactment of purely criminal statutes such as § 924(l) threaten the state-federal balance of power. Here as well, "the background principle that Congress does not normally intrude upon the police power of the States is critically important." *Bond*, 572 U.S. at 863. That intrusion into the state's police powers has to be justified by more than just the minimal nexus suggested here. There is no statutory construction here that would permit the court to avoid the constitutional questions posed by the statutes in *Jones* or *Bond*. Instead, the court must determine that the statute, as applied here, is an unconstitutional exercise of the Commerce Clause and violates the Tenth Amendment.

IV.   COUNT ONE, HOBBS ACT ROBBERY, AND COUNT FOUR, SECTION 922(g)(5) SHOULD BE SUBJECT TO THE SAME CONSTITUTIONAL CHALLENGE, BUT THE CONSTITUTIONAL CHALLENGE IS FORECLOSED BY CIRCUIT PRECEDENT

The argument that *Lopez* and *Morrison*'s "substantial effect" test should apply under the Hobbs Act, rather than the *de minimis* standard that is the law of this circuit, has been rejected. This may be because of the language: "[g]iven that the Hobbs Act prohibits the specified conduct if it affects commerce '*in any way or degree,*' 18 U.S.C. § 1951(a), we see no reason to alter this standard." *United States v. Elias,* 285 F.3d 183, 188 (2d Cir. 2002). Nonetheless, *Lopez* and the trio of cases following it should, in fact, require a new analysis of Hobbs prosecutions of intrastate activity. This court, like a panel of the Second Circuit Court of Appeals, is not empowered to effect a change without an overruling of that rationale by the Supreme Court or an *en banc* panel of the Second Circuit. *United States v. Davis*, 328 F.App'x 701, 704 (2d Cir. 2009) (citing *In re Sokolowski*, 205 F.3d 532, 534-35 (2d Cir. 2000) (internal quotations omitted)

(noting that this court is "bound by a decision of a prior panel unless and until its rationale is overruled, implicitly or expressly, by the Supreme Court or this court *en banc*").

As such, the precedent upholding the Hobbs Act precludes Mr. Camovic from raising a similar challenge here, except to do so to preserve the issue for appellate review. At some point, the Supreme Court will finally address the implication of cases like *Lopez*, *Jones*, and *Morrison* on the adoption of the aggregation principle for cases involving criminal, not commercial, activity and the lasting imprint of *Scarborough* on the interstate nexus question.

Similarly, with regard to Count Four, charging a violation of § 922(g)(5), possession of a firearm by a prohibited person (a person not lawfully admitted to the United States), S*carborough* and *Sorrentino* appear to preclude a constitutional challenge to the statute which contains a jurisdictional element. Nonetheless, the same concerns that *Scarborough* logically, intellectually and factually cannot square with the contemporary articulation of the Commerce Clause power and its expansive application to non-commercial criminal activity require Mr. Camovic to raise the issue to preserve it as to this statute as well. Again, the jurisdictional hook of § 922(g), which unlike §924(l) broadly invokes the "affecting commerce" third category (prohibiting possession in and affecting commerce) regulates activity that really has no effect on interstate commerce at all. Further, simply claiming that such a regulation is essentially the regulation of the larger "market" for firearms, in the vein of *Raich*, *Taylor*, and *Wickard*, reduces the constitutional argument to one in which the federal government could criminalize virtually every purely intrastate, local crime. The mere fact that there is a market for firearms, that firearms are bought and sold and are a commodity, cannot be the basis for a regulation that is directed solely at prohibiting a class of individuals from possessing them, as developed more fully in Point I. The Government cannot show that possessing this firearm – one that he wrestled

22

away from a New York City police officer during a brief struggle – had a substantial effect on interstate commerce or any effect at all. Nonetheless, the court is bound by precedent as to the constitutionality of §922 and the Hobbs Act, until and unless the Supreme Court expressly overrules *Scarborough*.

## V.    COUNT TWO, CHARGING A VIOLATION OF 924(C), IS DUPLICITOUS.

A defendant may be charged for two types of weapon-related offenses under § 924(c)(1). First, a defendant may be convicted for using or carrying a firearm during and in relation to a crime of violence. Second, a defendant may, in certain circumstances, be convicted under § 924(c)(1) for possessing a firearm "in furtherance of" a crime of violence. Count Two of the instant Indictment charges Camovic with both prongs of § 924(c). Although the Second Circuit has not determined whether these two portions of the statute constitute mere means of committing a single offense, or constitute two separate criminal offenses, other Courts of Appeal have, and this court should adopt that rationale in finding that Count Two is duplicitous.

The Sixth Circuit has concluded that § 924(c)(1)(A) "criminalizes two distinct offenses: (1) a 'use or carriage' offense, which has 'during and in relation to' as its 'standard of participation,' and (2) a 'possession' offense, which has 'in furtherance of' as its standard of participation." *United States v. Savoires*, 430 F.3d 375, 379 (6th Cir. 2005) (citing *United States v. Combs*, 369 F.3d 925, 930-33 (6th Cir. 2004)). The Eighth Circuit has come to a similar conclusion. *United States v. Gamboa*, 439 F.3d 768, 810 (8th Cir. 2006). Adopting that court's position, this Court would have to find that Count Two is duplicitous because it charges both the "use and carry" or carriage crime, and the possession crime.

The reasoning of the Sixth and Eight Circuits is sound. The statutory text clearly demarcates two offenses, rather than identifying alternative "means" to commit a single offense.

"The two prongs of the statute are separated by the disjunctive 'or,' which, according to the precepts of statutory construction, suggests the separate prongs must have different meanings." *United States v. Combs*, 369 F.3d 925, 931 (6th Cir. 2004) (citing *United States v. Hill,* 79 F.3d 1477, 1483 (6th Cir. 1996). The statutory language also "structures the prohibited acts into distinct dependent clauses with different modifiers." *Id*. More basically, the Sixth Circuit analysis emphasized that separate offenses require proof of an additional fact that the other does not, and the case law is firm that the Government must present different proof to show "using or carrying" "during and in relation" versus proof of "possession in furtherance." *Id.* at 930–33.

The legislative history also supports the conclusion that the statute creates two separate offenses. The current version was specifically drafted to respond to the Supreme Court decision in *Bailey v. United States*, 516 U.S. 137, 143-44 (1995) holding that "use" requires active employment and not "mere possession." The legislative history also quite clearly lays out Congress's intention to create a different standard of conduct with the "in furtherance" language. *Id*. The relevant cases in the district courts of this Circuit do not persuasively require an alternate finding.[3]

Finding the Sixth and Eighth Circuits' construction applicable, the Court may dismiss the indictment, or require the Government to elect to proceed based on only one of the distinct

---

[3] In *Harris v. United States*, No. 09-CV-4380, 2010 WL 2710600, at *2 (E.D.N.Y. July 6, 2010), the court rejected a challenge to defendant's conviction under the statute as duplicitous, finding no duplicity-related prejudice in the trial because "the jury instructions not only clearly specified the elements of the three potential ways to commit the [Section] 924(c) offense but also explicitly required that the jury be unanimous as to one of the three ways." The Court did not engage in the analysis of the statute's construction or legislative history or ultimately adopt the Ninth Circuit's reasoning which it favored. *Id*. In *Johnson v. United States*, No. 09 CIV-5554 (PAE), 2013 WL 103174 at *6 (S.D.N.Y. Jan. 9, 2013), *aff'd*, 779 F.2d 125 (2d Cir. 2015), the Court of Appeals acknowledged the split in circuits but did not address or resolve the split either, concluding that even if the court accepted the Sixth Circuit's reasoning that 924(c) constitutes multiple crimes, Johnson was not charged with possession in furtherance of a crime, only with using, carrying and brandishing a firearm "during and in relation to" a crime of violence, and thus could not obtain relief in any event. *Id.*

crimes contained in the §924(c) count. *United States v. Sturdivant*, 244 F.3d 71, 79 (2d Cir. 2001).

## VI.   COUNT TWO MUST BE DISMISSED BECAUSE HOBBS ACT ROBBERY IS CATEGORICALLY NOT A CRIME OF VIOLENCE

The 924(c) charge is predicated on the commission of Hobbs Act robbery. Section 924(c)(3)(A) defines a "crime of violence" as a felony that "has as an element the use, attempted use, or threatened use of physical force against the person or property of another." 18 U.S.C. § 924(c)(3)(A) (the "force clause"). In order to qualify as a crime of violence under the elements clause, the offense must have as an element the use, attempted use, or threatened use of "*violent* [physical force] – that is, force capable of causing physical pain or injury to another person." *Johnson v. United States*, 559 U.S. 133, 140 (2010); *United States v. Davis,* 139 S. Ct. 2319, 2325-26 (2019) (applying *Johnson* to §924(c)). The statute further defines "robbery" as "the unlawful taking or obtaining of personal property from the person or in the presence of another, against his will, by means of actual or threatened force, or violence, or fear of injury, immediate or future, to his person or property." 18 U.S.C. § 1951(b)(1).

The Second Circuit has found that Hobbs Act robbery is a crime of violence, rejecting the argument that placing a victim in fear of injury by threatening the indirect application of physical force is not sufficient to constitute the threatened use of physical force. *United States v. Hill*, 890 F.3d 51, 58–59 (2d Cir. 2018). The *Hill* court cited *United States v. Castleman,* 572 U.S. 157 (2014) for the proposition that "physical force" as it is employed in connection with § 922(g)(9) "encompasses even its indirect application," including, for instance, poisoning someone. *Id*. "That the harm occurs indirectly, rather than directly (as with a kick or punch), does not matter"

25

lest we conclude that pulling the trigger on a gun involves no use of force "because it is the bullet, not the trigger, that actually strikes the victim." *Id.* (quoting *Castleman*, 572 U.S. at 171).

This does not quite address the fact that the statute, as drafted, defines robbery as an unlawful taking "against his will, by means of actual or threatened force, or violence, or fear of injury, immediate or future, to his person or property." The *Hill* Court dismissed the idea that like "intimidation" element of the robbery statute, unintentional intimidation could cause the requisite fear of injury, but not involve direct application of force or threats of direct applications of force, because Hill could not point to cases in which the courts have applied the Hobbs Act in the manner so argued. 890 F.3d at 58–59.

Mr. Camovic avers that *Hill* is wrongly decided and, to preserve the issue, raises the arguments already dismissed by *Hill* and other courts. Specifically, the Hobbs Act could be violated by (1) by putting someone in "fear of injury ... to ... property," including intangible property, which does not necessarily involve any use or threatened use of physical force; (2) with force that does not qualify as "violent" force, and (3) unintentionally, given that the statute does not expressly require purposeful or knowing *mens rea*, and might therefore include the mental state of recklessness, which conduct  would not constitute a "crime of violence" because "use of force" requires direct action or targeting of an individual, thereby excluding reckless conduct which is not aimed in that manner. *See Borden v. United States,* ___ S.Ct. ___ (2021).

CONCLUSION

For all the foregoing reasons, Mr. Camovic respectfully requests the court to dismiss Counts Two and Count Three, and to preserve the issues raised in arguments for Counts One and Four.

Respectfully submitted,

*s/ Robert G. Stahl, Esq.*

Robert G. Stahl, Esq.
Laura K. Gasiorowski, Esq.
Attorneys for Dzenan Camovic