**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA

v.

DZENAN CAMOVIC

  Defendant.

CRIMINAL ACTION

No. 20-CR-326 (RPK)

<u>**MEMORANDUM OF LAW IN SUPPORT**</u>
<u>**OF DEFENDANT'S MOTION TO SUPPRESS**</u>

ROBERT G. STAHL, ESQ.
LAURA K. GASIOROWSKI, ESQ.
ANDREW C. OLESNYCKY, ESQ.
The Law Offices of Robert G. Stahl
53 Cardinal Drive, 3rd Floor
Westfield, NJ 07090
(908) 301-9001
*Attorney for Defendant, Dzenan Camovic*

TABLE OF CONTENTS

TABLE OF AUTHORITIES……………..……………………………………………………iii

PRELIMINARY STATEMENT………………………………………………………..…1

STATEMENT OF FACTS…………………………………………………………………..1

LEGAL ARGUMENT……………………………………………………………………8

I.   THE CONSENT TO SEARCH WAS INVOLUNTARY, THE PRODUCT OF
     COERCION AND TAINTED BY THE UNLAWFUL SEIZURE OF THE
     CAMOVICS AND THEIR HOME……………………………………………....8

II.  WITHOUT THE EVIDENCE GATHERED FROM THE UNLAWFUL CONSENT
     SEARCH, THE SEARCH WARRANTS FAIL TO ESTABLISH PROBABLE
     CAUSE………………………………………………………………………15

     1.  JUNE 4 LG PHONE WARRANT, 20-MJ-411…………………………………15
     2.  JUNE 5 WARRANT TO SEARCH ELECTRONIC DEVICES SEIZED
         DURING THE JUNE 4 CONSENT SEARCH, 20-MJ-414……………………16
     3.  THE JUNE 6 CORRECTIVE WARRANT, 20-MJ-424……………….……..16
     4.  THE JUNE 7 SUPPLEMENTAL ELECTONIC DEVICE WARRANT, 20-MJ-
         425……………………………………………………………………17
     5.  THE JUNE 9 DISCORD AFFIDAVIT, 20-MJ-423……………………….…….17
     6.  THE JUNE 9 JEFFERSONVILLE WARRANT, 20-MJ-426…………………...18
     7.  THE JUNE 10 CAMOVIC RESIDENCE SEARCH WARRANT, 20-MJ-427...18

CONCLUSION……………………………………………………………………..………19

TABLE OF AUTHORITIES

CASES

*California v. Hodari D.*, 499 U.S. 621 (1991)……………………………………...……11

*Davis v. United States*, 328 U.S. 582 (1946)……………………………………………...9

*Dunaway v. New York*, 442 U.S. 200 (1979)…………………………………………………12

*Florida v. Bostick*, 501 U.S. 429 (1991)…………………………………………………………12

*Florida v. Jimeno*, 500 U.S. 248 (1991)………………………………………………....10

*Georgia v. Randolph*, 547 U.S. 103 (2006)………………………………………………9

*Mincey v. Arizona*, 437 U.S. 385 (1978)………………………………………………10

*Rodriguez v. United States*, 575 U.S. 348 (2015)………………………………………12

*Schneckloth v. Bustamonte*, 412 U.S. 218 (1973)……………………………………………9, 10

*United States v. Calvente*, 722 F.2d 1019 (2d Cir. 1983)………………………………14

*United States v. Elliott*, 50 F.3d 180 (2d Cir. 1995)…………………………………9

*United States v. Faruolo*, 506 F.2d 490 (2d Cir. 1974)……………………………13

*United States v. Gori*, 230 F.3d 44 (2d Cir. 2000)…………………………………11

*United States v. Isiofia*, 370 F.3d 226 (2d Cir. 2004)………………………………9, 12

*United States v. Jacobson*, 466 U.S. 109 (1984)……………………………………...10

*United States v. Jerez*, 108 F.3d 684 (7th Cir. 1997)………………………………...8

*United States v. McCurdy*, 40 F.3d 1111 (10th Cir. 1994)…………………………9

*United States v. Montilla*, 928 F.2d 583 (2d Cir. 1991)………………………………14

*United States v. O'Brien*, 498 F.Supp.2d 520 (N.D.N.Y. 2007)…………………………13

*United States v. Oguns*, 921 F.2d 442 (2d Cir. 1990)…………………………………....13

*United States v. Peyton*, 745 F.3d 546 (D.D.C. 2014)………………………………14

*United States v. Place*, 462 U.S. 696 (1983)…………………………………………11

*United States v. Price*, 599 F.2d 494 (2d Cir. 1979)………………………………..10, 14

*United States v. Snype*, 441 F.3d 119 (2d Cir. 2006)………………………………14

*United States v. Tortorello*, 533 F.2d 809 (2d Cir. 1976)…………………………………………..13

*United States v. Trzaska*, 111 F.3d 1019 (2d Cir. 1997)…………………………………………15

*United States v. Tutino*, 883 F.2d 1125 (2d Cir. 1989)…………………………………………..13

*United States v. Vasquez*, 638 F.2d 507 (2d Cir. 1980)…………………………………………11, 14

*United States v. Watson*, 423 U.S. 411 (1976)…………………………………………………..10

SECONDARY SOURCES

"Allahu Akbar," Lexico, https://www.lexico.com/en/definition/allahu_akbar (last accessed June 25, 2021)…………………………………………………………………………….………5

Tomas Munita, "'Allahu Akbar': An Everyday Phrase, Tarnished by Attacks, N.Y. Times (Nov. 2, 2017), https://www.nytimes.com/2017/11/02/world/americas/allahu-akbar-terrorism.html.................................................................................................................5

PRELIMINARY STATEMENT

The instant motion seeks to suppress all evidence seized in a warrantless search from 580 East 22nd Street, Apartment 5 in Brooklyn on June 4, 2020. As the facts in the Certification of Husejin Camovic establish, the purported consent to search was not voluntary, was the product of duress and coercion, and was tainted by the illegal seizure of the Camovic home and its occupants for more than sixteen hours. The Government will not meet its burden to prove that consent was voluntary, or that it was not tainted by the Fourth Amendment violations that preceded it. Because evidence seized at the home was used to obtain successive search warrants, the court should also suppress all derivative evidence.

STATEMENT OF FACTS

The following facts are gleaned from the discovery provided to date, as well as the Affidavit of Husejin Camovic and the Certification of Counsel. At approximately 11:50 p.m. on June 3, 2020, in the vicinity of 885 Flatbush Avenue in Brooklyn, Dzenan Camovic allegedly approached two New York City Police Department (NYPD) officers on curfew enforcement patrol and stabbed one of the police officers. (DC_142). In the melee that followed, Mr. Camovic is alleged to have wrested a firearm from the other officer, and to have exchanged gunfire with several officers. (DC_142). Two officers are alleged to have suffered non-life-threatening gunshot wounds to their fingers. Mr. Camovic was shot at least eight times, suffering severe injuries for which he was hospitalized in critical condition. The entire encounter was recorded via police body-worn camera and surveillance footage from nearby businesses. (DC_142). The Government alleges that sixteen shots were fired by NYPD officers and six by Mr. Camovic.

Citing the video footage, the Government maintains that during the struggle Mr. Camovic yelled "Allahu Akbar," a phrase the Government asserts is "frequently exclaimed by perpetrators

1

of violent jihadist attacks." (DC_143). "Allahu Akbar" is a phrase that means "'God is most great,' [and is] used by Muslims in prayers and as a general declaration of faith or thanksgiving."[1] "Allahu Akbar is a common phrase that is invoked multiple times each day by law-abiding people of the Muslim faith, in daily prayer as well as in casual conversation.[2] Phrases rooted in Christian beliefs have achieved similar levels of ubiquity: for example, "Thank God" to express relief and/or thanks, or "Oh God" to express alarm. No evidence gathered at the scene suggested that the assault was inspired by radical Islamic political beliefs or coordinated with terrorist organizations.

Meanwhile, Dzenan's father, Husejin Camovic (hereinafter "Husejin"), was asleep in the family apartment located at 580 East 22nd Street. The family of eight lived in Apartment 5, a small but functional apartment consisting of three bedrooms, a living room, kitchen and two bathrooms located on the ground floor. (Husejin Affidavit, ¶¶ 1, 3). The rooms are off a long narrow hallway, and some of the windows of the rooms, including the bedroom of Husejin, look out onto the street. In a bedroom further down the hallway was his nineteen-year-old daughter, Dzenana. His oldest son, Dzenan, had gone to dinner with his cousin Ubeid, and was instructed to stay at that home if he could not be back by the 8 p.m. curfew. In addition, the family was always careful about walking the neighborhood at night, even when there was no lockdown or curfew, as there was frequently crime and sometimes violence in the area. Indeed that very night there were shootings in the area around the buildings where Dzenan's cousin worked. The remainder of the family, which consisted of Husejin's wife and three other children, were still at

---

[1] "Allahu Akbar," Lexico, https://www.lexico.com/en/definition/allahu_akbar (last accessed June 25, 2021).
[2] Tomas Munita, "'Allahu Akbar': An Everyday Phrase, Tarnished by Attacks, N.Y. Times (Nov. 2, 2017), https://www.nytimes.com/2017/11/02/world/americas/allahu-akbar-terrorism.html

a second home in upstate New York, where the family had decamped during the long, difficult months of COVID when New York City was in lockdown.

Sometime between 1 and 2 a.m. of June 4, 2020, Husejin was awoken by the sound of rapping on his windows and door. Eventually, he rolled up the blinds, and saw a large group of what appeared to be police officers outside. Like any parent faced with police officers at that hour, Husejin was distressed and fearful that something terrible had happened to a loved one. The early morning hour and police presence along with the recent shootings, ongoing protests and civil unrest, and COVID-related lockdowns indicated that perhaps something terrible had happened to his son or to another family member. Outside, one of the men stated "police" and asked him to open the door. (Husejin Affidavit, ¶ 5).

Husejin hurriedly dressed and left the apartment to the lobby of the building so that he could let the officers in. There were perhaps seven to ten officers. They asked for Apartment 5. Husejin indicated it was his apartment. An NYPD officer looked to his phone, and asked if he knew Dzenan Camovic. Husejin responded that Dzenan was his son. Now he was truly terrified. He asked what happened to Dzenan, seeking confirmation that his son was okay. The officer said that he wanted to talk inside the apartment, and so Husejin let them in to find out what happened to Dzenan. (*Id.*).

Instead, once the officers were inside, they refused to tell him anything about Dzenan. Several remained outside in the lobby area and the others entered the home. The police did not reveal that Dzenan had been involved in a shooting. Instead they told Husejin that there was some "accident" with the police, and that they had no other information. They were all standing in the narrow apartment hallway, with uniformed and non-uniformed officers, carrying visible guns, wearing bulletproof vests and radios crackling. Continuing to deflect questions about his

son and whether he was alive or dead, they began questioning Husejin in the hallway of the family apartment. (Husejin Affidavit, ¶ 6).

Dzenana stirred from sleep and opened her door, hearing all the talking. She asked "Babu, what happened" and was told only to stay in her room a little longer, as the NYPD was there. Still, the officers did not provide information about what happened to Dzenan, even after Husejin begged them to at least confirm whether he was dead or alive. The police did not ask if there were weapons in the house or perform a protective sweep. The officers continued to question Husejin about Dzenan without disclosing anything about their purpose or details about the shooting. Husejin tried to answer, but grew more concerned and agitated. His son was missing, the victim of some "accident," perhaps dead. His home was now filled with police who would not answer his questions.

After almost two hours or more of questions about his son from officers who continued to claim not to have any information or details, as yet, as to what had actually happened, Husejin demanded some end. He told them that if they were not going to answer his questions, they should leave. Husejin told the police to tell him he was under arrest, as he could not stay there without knowing what happened to his son. (Husejin Affidavit, ¶ 8).

A lead officer tried to placate him, stating he would go and get answers. Instead, he returned with the FBI. The FBI agents did not ask for consent to enter the home, but simply entered through the apartment door, which the NYPD officers had kept open. One of the agents told Husejin that he had heard that Husejin was asking about his son, and that he was there to tell him. He indicated that he wished to go into Dzenan's room to talk. He and another agent told Husejin to sit on the sofa while the agent took a seat at Dzenan's computer desk. A contingent of NYPD and/or FBI agents stood outside the door. Another agent stood nearby as Husejin learned

that his son had attacked police with a knife, with three officers injured and Dzenan shot eight times and in critical condition at a hospital. (Husejin Affidavit, ¶ 9).

Additional hours of confinement and interrogation followed, this time with a more coercive environment. From the beginning Husejin felt constrained, but when the FBI took control of the apartment, the coercive atmosphere heightened substantially. He was separated from Dzenana, his teenage daughter, who was confined in the living room and guarded by one or more female agents. Husejin was confined to Dzenan's room. He was not free to move about, and was never alone. He was told to place his phone on a table. He was not permitted to answer it, unless it was on speakerphone and he spoke in English. He could not see or speak with Dzenana who was surrounded by agents in another room. Concerned for her, Husejin asked if he could be with her and was told that he could not. He felt trapped and helpless in his own home. (Husejin Affidavit, ¶¶ 10, 11).

The agents continued to interrogate Husejin over the next several hours. They had many questions and often they were repeated as different agents came in and out. One agent picked up a bottle of medication given to Dzenan after an eye surgery, discussing the surgery and how he had taken the same medication. Another looked into the open closet, and asked questions about a weighted vest Dzenan would run with.

Husejin did not believe he could leave. The house had been under lockdown now for hours. He had not slept or eaten since the police first arrived. He was not provided food or water. When he went to the bathroom it was only with permission, and under supervision of the agents. Areas of the home were cordoned off from the father and daughter, whose movements were controlled and monitored. The family were being treated as suspects. (Husejin Affidavit, ¶ 12).

Meanwhile, Dzenana had been ordered to the living room and instructed to sit on the sofa, which was searched. Dzenana had been texting with her sister earlier, but now she was instructed to put the phone on the counter. She was confined in that room as well, not permitted to move about. She had to ask permission to go to the bathroom. First an agent had to search it. She, too, had not eaten or had anything to drink, and nothing was offered to her. Eventually, she, too, was subjected to aggressive interrogation by a female agent. She was questioned extensively about her brother, friends, and family, and the agent went through the texts on her phone, which she had picked up off the counter.

Meanwhile, in Dzenan's room, Husejin was also being strenuously interrogated. He was exhausted, hungry and sleep deprived. Law enforcement had now been in the apartment almost eight (8) hours. Husejin wanted access to his phone. If Dzenan was dead or dying, Husejin wanted family there to see him one last time, so he asked to call his family so that they could come back to the city. Around 9 a.m., his brother-in-law Saudin called. The agents let Husejin answer on speakerphone and on the condition they speak in English. Saudin told Husejin that they had hired an attorney for him and that the interrogation was to cease immediately. Indeed, aware that the agents were in the room and that he was on speakerphone, Saudin addressed them directly to ensure that there was no confusion or uncertainty. There was to be no more questioning. If they wanted to talk, the FBI would have to talk through the lawyer for Husejin. An FBI 302 turned over in discovery stated that "[*t*]*he interview was halted at this time*," indicating that it was approximately 9 a.m. in the morning. (DC_1124); (Husejin Affidavit, ¶ 13).

Despite this, agents tried to dissuade Husejin from remaining silent and they resumed their questioning. The FBI did not leave his apartment, and did not stop interrogating him. Two new agents came into the room. The duress and coercive tactics heightened, focusing on using

Dzenana to overcome her father's will. Agents that had been with Husejin went to the living room and told Dzenana that if she talked to them, they could help her. If she did not want to talk, they would call ICE. An agent suggested that he had "friends," implying that he would intervene in her immigration case if the family cooperated. Aware that agents were now speaking with his young daughter after he had made clear there would be no more questioning without a lawyer, Husejin tried to intervene. His efforts to protect his daughter and continue to assert their right to counsel brought additional pressure and manipulation. The agents told him that they were not talking about Dzenan's case with her; they were talking to her about her "immigration" case. They talked to him about her "illegal" status. They indicated to him that if he did not cooperate they would have to call ICE to take his daughter away. Husejin was aware that he was now being directly threatened with retaliation against his daughter for not "cooperating" and insisting on his right to have a lawyer present for any further interactions with law enforcement. He accused the agents of threatening him and they simply stated that they were telling him what would happen. (Husejin Affidavit, ¶ 15).

What the agents really wanted soon became clear. The agents wanted to search the apartment. Husejin believed that he should wait to speak with the attorney. The agents then told Husejin that he had two choices. He could either wait with them in the apartment until the next morning, when they retrieved a search warrant from the courthouse, or he could agree to consent to the search now, and they could do the search today. The precise time of the agents' first mention of a consent search is unclear, but when consent was requested, Husejin and Dzenana had likely been detained for well over twelve (12) hours. In that time, neither had anything to eat or drink, and had been held under the control of law enforcement. Husejin, who provided the purported consent, had not slept and had been threatened with the arrest and deportation of his

7

daughter. Compounding the pressure to consent, he was told that he faced another overnight detention in his own home with the agents under essentially house arrest until a warrant could be obtained from the courthouse. This meant another eighteen (18) hours of additional detention. Husejin was even more concerned about his teenage daughter, given the threats being made. The "choice" presented to him was no choice. Husejin later signed the consent to search form, under duress, at 5:20 p.m. on June 4, 2020, after over fourteen (14) hours of detention and persistent interrogation in his own home. (Husejin Affidavit, ¶¶ 16, 17)

LEGAL ARGUMENT

I.    THE CONSENT TO SEARCH WAS INVOLUNTARY, THE PRODUCT OF
       COERCION AND TAINTED BY THE UNLAWFUL SEIZURE OF THE
       CAMOVICS AND THEIR HOME

As the Seventh Circuit observed in *United States v. Jerez*, 108 F.3d 684, 690 (7th Cir. 1997):

> because our law and legal traditions long have recognized the special vulnerability of those awakened in the night by a police intrusion at their dwelling place, our Fourth Amendment jurisprudence counsels that, when a knock at the door comes in the dead of night, the nature and effect of the intrusion into the privacy of the dwelling place must be examined with the greatest of caution.

Such caution is well deserved here. Neither the NYPD nor the FBI had a search warrant when they rapped on Husejin Camovic's apartment window in the dead of night.[3]  Consent to enter the building was premised on his wanting to know what had happened to his son. The "accident" in which his son was involved was merely a pretext to enter the home without a warrant, and then remain there with an illusory promise that more information would be forthcoming. As

---

[3] In fact, the police did not have probable cause at that time for a search warrant. The only information they had was that an individual assaulted police officers about a mile from his family's apartment and shouted Allahu Akbar. There was no probable cause to believe that evidence of the assault could be located within the family residence. Hundreds of individuals were arrested during the protests, including several for firebombing police vehicles, assaults on officers and other "violent" acts, but to our knowledge, their homes were not searched.

8

Mr. Camovic's Affidavit evidences, the "knock and talk" turned into an unreasonable seizure of his home and person.

More than ten (10) hours later, the Government contended that Husejin provided voluntary consent to the search of his home, as evidenced by the consent form signed at 5:20 p.m. on the evening of June 4, 2020, more than sixteen (16) hours after the knock on the door by the NYPD. What happened in between, from 1 a.m. to that time, vitiates any claim that the consent was voluntary, and establishes that it was tainted by the coercive, persistent custodial interrogation, the threat of ICE and the unreasonable seizure of the home and its occupants.

The case law regarding consent, the standard for determining voluntariness, and the constitutional implications of the lengthy seizure of the home and its occupants is clear and well-established. A warrantless entry and search of a home is "per se unreasonable" and thus constitutionally permissible only if the Government demonstrates one of the carefully delineated exceptions. *United States v. Elliot*, 50 F.3d 180, 185 (2d Cir. 1995) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973)). Here, the Government has indicated that it will rely on the "jealously and carefully drawn exception" of voluntary consent. *Georgia v. Randolph*, 547 U.S. 103, 109 (2006) (quotations and citations omitted); *Davis v. United States*, 328 U.S. 582, 593-94 (1946). The Government bears the burden of establishing that consent was voluntary. *United States v. Isiofia*, 370 F.3d 226, 230 (2d Cir. 2004). Under the circumstances here, the Government cannot establish "there was no duress or coercion, express or implied, [and] that the consent was unequivocal and specific, and that it was freely and intelligently given." *United States v. McCurdy*, 40 F.3d 1111, 1119 (10th Cir. 1994) (further citations and internal quotations omitted); *Isiofia*, 370 F.3d at 230.

"[T]he question whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." *Schneckloth*, 412 U.S. at 227; *United States v. Watson*, 423 U.S. 411, 424-25 (1976). "Under the "totality of the circumstances" test, it is appropriate to take into account both the characteristics of the accused (such as youth, education, and intelligence) and the details of the interrogation (such as duration and location)." *United States v. Price*, 599 F.2d 494, 503 (2d Cir. 1979). Thus, it is appropriate for the court to consider the possibly vulnerable subjective state of the person who consents, *Schneckloth*, 412 U.S. at 226, 228-29, as well as a "careful evaluation of all the circumstances of the interrogation." *Mincey v. Arizona*, 437 U.S. 385, 401 (1978).

The issue of whether Husejin gave voluntary consent to the search must be examined from that first entry into the home, after midnight, with a claim of an "accident." The initial consent was limited in scope, as defined by the object of that permission, which was to learn what had happened to his son. *Florida v. Jimeno*, 500 U.S. 248, 252 (1991) (noting "[a] suspect may of course delimit as he chooses the scope of the search to which he consents"). Once entry had been gained by this pretext, the ostensibly "voluntary" encounter between police and the family evolved into a seizure. The occupation of that apartment and the confinement of its occupants to separate living areas, isolated and cut off from freely communicating with each other and subject to the dominion and control of law enforcement in the sanctity of one's own home undoubtedly constituted a seizure of the home and its occupants. *See United States v. Jacobson*, 466 U.S. 109, 113 (1984) (explaining a Fourth Amendment "seizure" occurs "when there is some meaningful [government] interference with an individual's possessory interests in ... property"). In occupying the apartment for that length of time (some eighteen hours), and with

10

that number of agents, and controlling the movement in and use of that apartment by its occupants, law enforcement had taken possession of the apartment and its contents, which effected a seizure in the Fourth Amendment sense. *See California v. Hodari D.*, 499 U.S. 621, 624 (1991). That seizure was clearly unreasonable. The officers would not tell Husejin why they were there, how long they were staying, the length of time he might have to answer their questions, or what could make them leave, a possibility that Husejin did not consider in his power under the circumstances. *See United States v. Place*, 462 U.S. 696, 708 (1983) (finding ninety-minute detention of defendant's luggage sufficient to render the seizure unreasonable, exacerbated by the failure of the agents to accurately inform respondent of the place to which they were transporting his luggage, of the length of time he might be dispossessed, and of what arrangements would be made for return of the luggage if the investigation dispelled their suspicion).

Husejin and his daughter were seized for Fourth Amendment purposes as well. A seizure of a person occurs if "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Gori*, 230 F.3d 44, 49 (2d Cir. 2000) (quoting *United States v. Mendenhall*, 446 U.S. 544, 554, (1980)). "Law enforcement officers may, of course, briefly stop a person without arresting him; to the extent, however, that the stop has the effect of restraining the individual's freedom to walk away, the Fourth Amendment requires that the stop be reasonable." *United States v. Vasquez*, 638 F.2d 507, 520 (2d Cir. 1980). Here, the purported purpose of law enforcement's entry into the apartment was to provide information on an "accident" with the police in which Dzenan Camovic was involved, but Husejin and his daughter were detained for many hours with significant restraints on their freedom. The circumstances of that detention and restraint on their

liberty and property interests was not justified, and constituted an unreasonable detention unsupported by probable cause. *Dunaway v. New York*, 442 U.S. 200, 214-15 (1979); *Rodriguez v. United States,* 575 U.S. 348, 354-58 (2015) (holding that once an officer finishes addressing the infraction that forms the basis of a traffic stop, he or she may not lengthen the duration of the detention without effecting an unlawful seizure of the person).

When evaluating the propriety of police tactics, the court can consider the length and nature of the questioning and the threats, implicit and explicit. *Isiofia*, 370 F.3d at 232-234.  The accusatory, persistent and intrusive questioning contributed to the coercive environment. *Florida v. Bostick*, 501 U.S. 429, 437 (1991). The restraints on the home and on the family's liberty was substantial. Multiple agents guarded the perimeter of the home, and controlled ingress and egress. Within the home, Husejin was confined to his son's bedroom, while his young daughter was confined to the living room and instructed to remain on the sofa and not to move. In addition, there were officers outside the door of the room where he was confined and at the door of his apartment, which was kept open by law enforcement to permit them to come and go at their discretion, not his. Although it was his home, Husejin was not permitted to move about freely. His actions, his movement, his ability to communicate with family were all controlled by law enforcement. He had his phone taken away, and when he was permitted to use it, he had to speak in English and on speakerphone. He asked and was denied the right to be with his daughter, in his own home, or to communicate with her freely. While for most people a home is a sanctuary from government intrusion, Husejin's home was transformed into a police interrogation room and jail cell with twenty four hour guards.

As a product of this unreasonable seizure, and under the coercive conditions in which Husejin found himself a prisoner in his own home, his consent was not voluntary. Again, there

was an overwhelming police presence with at least seven to ten law enforcement officers inside

the home, with more agents appearing during the hours and hours of questioning, blocking exits,

and treating Dzenana and Husejin as suspects whose movements were monitored and controlled.

*See United States v. O'Brien*, 498 F.Supp.2d 520, 536-37 (N.D.N.Y. 2007), *aff'd*, 303 F.App'x

948 (2d Cir. 2008) (citing *United States v. Drayton,* 536 U.S. 194, 204 (2002)) (explaining

overwhelming show of force, intimidating movements, blocking of exits, threats, commands or

authoritative tone of voice, and show of badge are all factors to consider in determining scope

and voluntariness of consent). The court may also consider the unreasonable seizure of the

apartment and its contents and agents' intrusions into the occupants' privacy and property

interests, such as looking into closets, taking possession of phones, examining medication, and

controlling the occupants' movements and communication, as well as ingress and egress of

anyone else. *Id*. (citing *United States. v. Baro,* 15 F.3d 563, 567 n.1 (6th Cir. 1994))

(impermissible seizure of property preceding consent); *United States v. Oguns,* 921 F.2d 442,

448 (2d Cir. 1990) (impermissible home entry and seizure of evidence before consent); *United

States v. Tortorello,* 533 F.2d 809, 815 (2d Cir. 1976) (same). The agents' custodial interrogation

and the badges of an arrest, combined with improper threats implicating Dzenana and Husejin as

possible terrorists or collaborators, and threats to notify ICE or effect a deportation of his child if

Husejin did not cooperate are also indicia that his will was overborne. *O'Brien*, 498 F.Supp.2d at

536-37 (citing *United States v. Faruolo,* 506 F.2d 490, 493 (2d Cir. 1974)) (finding improper

threats to arrest family). The consent sought from Husejin was not a choice. Agents indicated

that they would get a warrant and require Husejin and Dzenana to remain captive in their own

home with all the agents for another day unless he consented. *See United States v. Tutino,* 883

F.2d 1125, 1137 (2d Cir. 1989); *Faruolo,* 506 F.2d at 493 (noting when police say they will

13

obtain a warrant, "they confront the [consenter] with a choice that totally obliterates the important protective function of the warrant-issuing process"). Subjective aspects, such as Husejin's age, lack of any prior involvement with the criminal justice system, education, and growth in a foreign country with a much different system of laws and status are also relevant to the determination that his consent was not voluntary. *United States v. Calvente,* 722 F.2d 1019, 1023 (2d Cir. 1983) (age, literacy, demeanor, prior legal experience); *Price*, 599 F.2d at 503 (age, maturity, education, intelligence, experience).

Even assuming *arguendo* that the Government could demonstrate "voluntary" consent, a consent search following an illegal seizure will be invalid unless the Government demonstrates that "the consent was 'sufficiently an act of free will to purge the primary taint of the unlawful' act." *Vasquez*, 638 F.2d at 527-28 (quoting *Brown v. Illinois*, 422 U.S. 590, 599 (1975)). The Government cannot demonstrate that the taint of the unlawful seizure "had been dissipated before the consent was given."  *United States v. Montilla*, 928 F.2d 583, 590 n.3 (2d Cir. 1991). Indeed, law enforcement increased their pressure and duress leading up to consent, including interference with Husejin's right to counsel, threats to call Immigration on his daughter if he did not cooperate, and the Hobson's choice of continuing to remain a prisoner in his own home until the next day, when supposedly the "warrant" would be picked up from the courthouse, or consenting at that moment.

As a corollary issue, with regard to some of the items seized, consent to search a family member's bedroom does not extend to the search of closed containers and the interiors of enclosed spaces, nor to personal electronics. *See United States v. Snype*, 441 F.3d 119, 136 (2d Cir. 2006); *United States v. Peyton*, 745 F.3d 546 (D.D.C. 2014) (grandmother's consent to search bedroom did not extent to closed containers). Much of the evidence of religious DVDs,

CDs, and other items cited by the Government in the search warrant affidavits appear to have been removed from a folder in Dzenan's closet and drawers of his desk. Further exploration of where those items were seized needs to be examined and developed.

II.    WITHOUT THE EVIDENCE GATHERED FROM THE UNLAWFUL CONSENT SEARCH, THE SEARCH WARRANTS FAIL TO ESTABLISH PROBABLE CAUSE

Finally, because the illegally seized June 4 consent search evidence formed the basis of the first search warrant affidavit and, derivatively, each subsequent affidavit, the search warrants and evidence seized pursuant to them are tainted. *United States v. Trzaska*, 111 F.3d 1019, 1026 (2d Cir. 1997) (illegally seized evidence may not serve as the basis for probable cause in a search warrant affidavit) (citing *Wong Sun v. United States*, 371 U.S. 471, 484-85 (1963)).

If the "evidence" seized from the alleged consent search is suppressed, then the subsequent seven search warrants for electronics and other items, premised almost entirely on the inferences drawn from those items to establish probable cause, must be suppressed for lack of probable cause to issue. Search warrants were issued for the following items (more fully detailed in the Attorney Certification):

1.    JUNE 4 LG PHONE WARRANT, 20-MJ-411.

At 9:22 p.m. on June 4, 2020, United States Magistrate Judge Steven M. Gold issued a search warrant authorizing a search of the LG phone that was seized from Mr. Camovic's person incident to arrest (Exh. D to Stahl Certification), based upon an affidavit submitted by Special Agent Colin McClafferty. (DC_24-48). The probable cause was based largely upon items seized from the defendant's bedroom during the consent search of June 4. If those items, and the inferences therefrom are excised, the warrant fails to establish probable cause to search.

15

2.  JUNE 5 WARRANT TO SEARCH ELECTRONIC DEVICES SEIZED DURING THE
    JUNE 4 CONSENT SEARCH, 20-MJ-414.

At 6:03 p.m. on June 5, 2020, Magistrate Judge Gold issued a search warrant, 20-MJ-414,

authorizing a search and forensic examination of the electronic devices and media[4] seized from

the Camovic residence "pursuant to a consensual search on or about June 4, 2020." (Exh. E to

Stahl Certification, DC_51). This warrant, too, relied largely upon evidence uncovered and

seized during the flawed June 4 consent search to support the notion that Mr. Camovic's alleged

attack was carried out in furtherance of a religious extremist ideology or that it was perpetrated

with the assistance or guidance of co-conspirators.

3.  THE JUNE 6 CORRECTIVE WARRANT, 20-MJ-424

On June 6, 2020 at 5:48 p.m., Magistrate Judge Gold issued a search warrant (Exh. F to Stahl

Certification) authorizing the search of a Phillips Voicetracer digital recorder and a silver iPhone

that were seized during the June 4 consent search. (Exhibit H, DC_76-80). The purpose of this

warrant was to correct an inaccurate serial number for the iPhone listed in the June 5 device

warrant, and to include reference to the Philips Voicetracer, which was not included in the June 5

device warrant. (*Id.* at DC_81). The June 6 corrective warrant incorporated by reference and

relied upon the June 5 device warrant affidavit to establish probable cause for the requested

search warrant. (*Id.* at DC_82).

---

[4] The media and devices, referred to as "the Subject Devices" by the Government, were specified as: "1. One black
Samsung mobile phone, IMEI # 358689100215795 2. One gold Samsung mobile phone, IMEI # 354255092268384
3. One Sandisk 64 GB hard drive 4. One Kingston 4 GB hard drive 5. One Samsung tablet, model SM-T520 6. One
silver iPhone, Model A1660, FCC ID #BCG-E308512 7. One Polaroid tablet, model PMID1000B 8. Twenty-four
(21) compact discs or digital video discs." (DC_51).

4.   THE JUNE 7 SUPPLEMENTAL ELECTONIC DEVICE WARRANT, 20-MJ-425.

On June 7, 2020 at 12:34 p.m., Magistrate Judge Gold issued a search warrant (Exh. G to Stahl Certification) authorizing a forensic examination of the electronic devices obtained during the June 4 consent search inside the Camovic residence. (DC_94). The purpose of the June 7 electronic device warrant was to expand the scope of the search to include all the files on the subject devices that were created or accessed from January 1, 2019 through the present, due to the discovery of evidence that, in the Government's view, revealed the presence of jihadist materials on Mr. Camovic's electronic storage devices as early as March 29, 2019. (DC_105, ¶10).

The accompanying affidavit authored by Special Agent McLafferty (hereinafter "the June 7 Supplemental Device Warrant Affidavit") incorporated certain new evidence uncovered during the search of Mr. Camovic's LG phone, pursuant to the June 4 LG Phone Warrant. (*See* DC_99, DC-103 to DC-106). As noted above, however, the June 4 LG Phone Warrant relied largely upon evidence obtained during the June 4 Consent Search to authorize the intrusion into Mr. Camovic's LG phone.

5.   THE JUNE 9 DISCORD AFFIDAVIT, 20-MJ-423.

On June 9, 2020 at 12:08 a.m., Magistrate Judge Sanket J. Bulsara issued at search warrant authorizing a search and seizure of electronic information stored by Discord, Inc., for communications associated with a Discord account allegedly owned and operated by Mr. Camovic (Exh. H to Stahl Certification). The affidavit accompanying the warrant cites primarily to the evidence set forth in prior search warrant affidavits.

6.   THE JUNE 9 JEFFERSONVILLE WARRANT, 20-MJ-426.

On June 9, 2020 at 8:33 p.m., Magistrate Judge Bulsara authorized a search warrant for a residence located in Jeffersonville, New York. Law enforcement was permitted to search for and seize several electronic devices believed to be contained therein. (Exh. I to Stahl Certification); (DC_173 to DC_202). The affidavit in support was built largely upon the material cited in the earlier affidavits addressed above, but incorporated certain new materials uncovered during the forensic examinations authorized by the June 7 supplemental electronic device warrant.

7.   THE JUNE 10 CAMOVIC RESIDENCE SEARCH WARRANT, 20-MJ-427.

Because no electronic devices were found in the Jeffersonville residence, Magistrate Judge James Orenstein issued a search and seizure warrant on June 10, 2020 at 4:50 p.m. authorizing a search of 580 East 22nd Street, Apartment #5, Brooklyn, New York. (Exh. J to Stahl Certification). The warrant was granted based on an assertion by law enforcement that the electronic devices expected to have been found in the Jeffersonville residence had been moved to the Camovic residence in Brooklyn. (DC_246). The affidavit in support of the warrant (hereinafter "the June 10 Camovic Residence Affidavit") incorporated by reference the entire Jeffersonville search warrant affidavit and noted that Magistrate Judge Bulsara had already granted a search warrant authorizing the seizure of devices expected to be found in the Camovic residence. (DC_239, ¶¶ 8, 9). Citing statements by Husejin, the June 10 Camovic Residence Affidavit asserted that law enforcement had received information that the electronic devices sought in the June 9 Jeffersonville search warrant had been taken from the Jeffersonville house back to the Camovic residence by members of the Camovic family. Accordingly, the validity of the June 10 Camovic residence search warrant is dependent on the validity of the June 9 Jeffersonville search warrant.

CONCLUSION

The facts as established by the Attorney Certification, Husejin Camovic's Affidavit, and the case law raise serious doubts about the validity of the alleged consent and create sufficient, substantial disputes of material facts that warrant an evidentiary hearing and eventual suppression of evidence seized from Dzenan Camovic's room, as well as evidence later seized as the result of multiple search warrants successively issued on the basis of that tainted evidence.

Respectfully submitted,

*s/ Robert G. Stahl, Esq.*

Robert G. Stahl, Esq.
Laura K. Gasiorowski, Esq.
Attorneys for Dzenan Camovic

19