UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

v.

DZENAN CAMOVIC

Defendant.

CRIMINAL ACTION

No. 20-CR-326 (RPK)

AFFIDAVIT OF HUSEJIN CAMOVIC
IN SUPPORT OF MOTION TO
SUPPRESS EVIDENCE

The undersigned, Husejin Camovic, of full age, upon my oath hereby declare under penalty of perjury, pursuant to U.S.C. § 1746, that:

1. I am the father of Dzenan Camovic and I make the following statements based on my best recollection of the events of the early morning of June 4, 2020, beginning around 1:00 a.m. until later that evening around 8;00 p.m.

2. I am not a United States citizen and while I speak and understand English fairly well, it is not my first language. I have a very limited understanding of United States laws. I have never been arrested.

3. On June 3, 2020, I was at my apartment at 580 East 22nd Street, Apartment 5, with my nineteen-year-old daughter, Dzenana. My wife and my other children were at our house in upstate New York, where they spent most of their time while New York City was in COVID-19 lockdown. My son, Dzenan, was also living in Apartment 5 at the time, but was not home when the police came.

4. Dzenan had told me at around 6 p.m. that he was going to spend the night at his cousin's house because he was likely not going to make it back before the 8:00 p.m. curfew. I believed he was sleeping at his cousin's house..

5. At around 1:00 a.m. to 2:00 a.m. in the early morning of June 4, 2020, I heard a knock on a window. There were about seven to ten police officers outside, some of them in NYPD uniforms and others in plain clothes. They told me that they were the police and they asked if they could come inside the lobby. I let them in. They asked for Apartment 5 and I told them it was mine. They asked if I knew Dzenan Camovic and I was immediately afraid something terrible had happened. They would not tell me what, if anything had happened to him and asked if we could talk inside the apartment. I let them in because I was worried that something had happened with Dzenan and that the only way they would tell me what had happened is if I let them inside. I was worried about Dzenan because of the curfew, he was not at home and it was past midnight, and we live in a dangerous area.

6. At first, about four or five NYPD officers came into the apartment, while the rest remained outside. When they came in, I asked what happened and they would only tell me that there was an "accident" with the police. I asked for more information, and they said they didn't know. People were coming in and out, and it was loud and confusing. Some were wearing guns and bullet-proof vests, and used radios. They were asking questions about Dzenan, but not giving information about what happened. At that time, it seemed that it was only NYPD officers and not FBI and federal agents.

7. At one point while the police were in my apartment, an NYPD officer who was asking me questions recorded my conversation with him. I did not know I was being recorded at the time and only learned that I was recorded later. During the recorded conversation, the NYPD officer asked me where Dzenan's room was and I showed him. He asked "mind if I take a look," and I allowed him to. He also said that he wanted to take pictures.

8. I grew frustrated. The NYPD were in our home for hours and yet refused to tell us anything about what had happened to Dzenan. I told them "if you are not going to tell me anything, then you have to leave." The officer who seemed to be in charge came back about fifteen minutes later with FBI agents. Two FBI agents walked right in through the open door and told me to go to Dzenan's room and said to sit down, while the NYPD

officers remained in the hallway. They told me Dzenan attacked police with a knife, that three officers were hurt, and that Dzenan was shot eight times and was in the hospital in critical condition. I was in tears.

9. During the time the NYPD were in our home, I did not feel that I could leave or to refuse to cooperate with them I also wanted information on whether my son was alive. I felt that I had to answer the questions they were asking me about Dzenan.

10. After the federal agents arrived they were much more controlling of my movements. Though I am not certain, because I was tired and upset, I believe the federal agents arrived at roughly 4 a.m. The federal agents did not allow me to be with my daughter; they said that I had to speak to them in Dzenan's room, while Dzenana had to remain in the living room, even though I requested that we be allowed to be together. I said that she is a woman, my daughter, and I wanted to be with her. They refused to allow us to be in the same room or let me talk to her.

11. When the federal agents arrived they told me to sit on the sofa in Dzenan's room and one agent sat on a computer chair while the other stood. Dzenan's room is small, about 9 feet by 10 feet, and I was in there with two agents at first. That is when they told me what happened to Dzenan. They said Dzenan had attacked a police officer with a knife, another with a gun, and shot at police and that he had been shot several times and was in critical condition. Then, for approximately five hours, until about 9:00 a.m., they asked me a lot of questions about Dzenan and our family background.

12. During this time, I had no food, no water. I was confined to the room but had permission to go to the bathroom, and to pray. They were there so long, I did three prayers. Dzenana was kept in the living room, on the sofa, and also was not permitted to move and had to ask permission to use the bathroom in our own home.

13. The FBI agents had asked for my phone when they put me in Dzenan's room. It was placed next to them. At one point, they kept it in the living room or kitchen with

Dzenana's phone.  They let me use it to call my family because if my son was dead or going to die, I wanted my family here. I called them to come back.  At approximately 9:00 a.m. my brother-in-law Saudin called my cellphone. The agents instructed me to answer the phone call on speakerphone and to speak only in English. Saudin said very clearly, in English, that he had hired me a lawyer, and not to answer any questions. I think Saudin even told the agents the lawyer's name. I also told the agents that I did not want to answer any more questions because I had a lawyer. In response, two male agents (an older male and a younger male who arrived later) tried to convince me to change my mind.

14. From the arrival of the federal agents to the time I told them I had a lawyer, I was in kept in Dzenan's room, while Dzenana was kept in the living room. Agents were coming in and out of the apartment without asking permission and were looking around. For example:

    a. They looked at pills that were on Dzenan's desk and at a weighted running vest in Dzenan's closet, which they asked me about.

    b. If I wanted to go to the bathroom, an agent would escort me to the bathroom. I was not permitted to be alone. I was never left alone with less than two agents and at times there were five or six in Dzenan's small room.

    c. I did not feel at any time that I was free to leave or to ask the agents to leave.

15. After I got the lawyer and told the agents I would not answer any more questions, the agents questioned my daughter in the other room. I jumped up and went into the room to tell them stop asking Dzenana questions, the female agent guarding Dzenana told me "you're not allowed to be here," and they made me to go back to Dzenan's room.  As they led me back to the room where I was to be held, I yelled to the agents to stop questioning Dzenana and I told her not to answer any questions. To this, they said "we are not questioning her about Dzenan's case, we are questioning her about her immigration case."  They said that they will call immigration police, or ICE, to take her away. While my daughter has no legal status in the United States, she does not have an "immigration case." Based on that, and the tone and tenor of their statements, I said,

"now you are threatening me?" They said that since I am not cooperating, that calling ICE is what they would have to do. If I cooperated, they would help me.

16. Then, the agents told me that I had two choices. I could wait in the house with all of them until the next day, when they could pick up the search warrant from the court house, or I could give them my consent to search the house now. We had already been held there for hours and hours. I was worried for my daughter. They did not offer us food or anything to drink, and were just waiting there. We did not have access to our phones, we were not allowed to move around freely or without an escort, and I was separated from Dzenana. The agents kept saying that Dzenana was going to be deported, I agreed.
Still, they did not leave. Hours had gone by since Saud's call. Finally, the agents brought me a paper for me to sign. I learned later that this was at 5 p.m. They brought me a paper and said, "we have to search the apartment" and said that I can't leave the apartment until we search. Once I signed the consent form, an all-new group came to search and took pictures and video, as well as drawings of the apartment while we remained there until they were done.

17. At no time did I ever feel free to leave, or that the agents would leave if I asked. I only signed the consent form because the agents told me that they had to search the apartment, that they will get a search warrant, and that if I didn't consent now my daughter and I would be forced to stay in the apartment all night with the agents until they got the warrant from the court the next morning. The whole time I did not know if my son was dead or dying, only that he was in critical condition.

I hereby certify that the foregoing statements made by me are true. I am aware that if any of the above statements made by me are willfully false, I am subject to punishment.

Husejin Camovic

Sworn and subscribed
Before me this 25th day
of June, 2021

Notary Public

KHALIFA N HASSAN
NOTARY PUBLIC, State of New York
No. 01HA4938934
Qualified in Kings County
Commission Expires 07/24/2022